**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | | |
|---|---|---|
| ALSTORY SIMON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. |
| NORTHWESTERN UNIVERSITY, DAVID | ) | |
| PROTESS, PAUL J. CIOLINO, and JACK P. | ) | |
| RIMLAND, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, ALSTORY SIMON, by his attorneys, complains of Defendants, NORTHWESTERN UNIVERSITY, DAVID PROTESS, PAUL J. CIOLINO, and JACK P. RIMLAND, as follows:

## INTRODUCTION

1.      In 1999, Plaintiff Alstory Simon was wrongfully incarcerated for a double-murder he did not commit. Arrested at the age of 48, Simon spent more than 15 years in prison before he was ultimately exonerated on October 30, 2014.

2.      The horrific injustice that befell Simon occurred when Defendants, Northwestern University Professor David Protess, Northwestern University private investigator Paul Ciolino, and attorney Jack Rimland, conspired to frame Simon for the murders in order to secure the release of the real killer, Anthony Porter.

3.      As part of a Northwestern University Investigative Journalism class he taught in 1998, Protess instructed his students to investigate Porter's case and develop evidence of Porter's innocence, rather than to search for the truth. During that investigation, Northwestern, through its

employees and/or agents Protess and Ciolino, intentionally manufactured false witness statements against Simon and then used the fabricated evidence, along with terrifying threats and other illegal and deceitful tactics, to coerce a knowingly false confession from Simon.

4.      In furtherance of the conspiracy to frame Simon and free Porter, Northwestern, through its employees and/or agents Protess and Ciolino, hired attorney Jack Rimland to represent Simon. Acting in concert with Protess and Ciolino, Rimland coerced Simon to plead guilty despite his innocence by lying to Simon about the strength of the evidence against him, withholding compelling eyewitness grand jury testimony implicating Porter, and threatening Simon.

5.      On October 30, 2014, the Cook County State's Attorney's Office, following an exhaustive one year investigation, vacated Simon's conviction and dismissed all criminal charges after finding that Northwestern's conduct and purported investigation was "deeply corroded and corrupted," and beset by "alarming" and illegal investigative tactics which may also have been criminal in nature.

6.      As set forth below, Northwestern styled Protess' class as an "Investigative Journalism" class but, in reality, very little, if any, journalism was conducted. Northwestern was aware of, and approved and ratified, the fact that the students did not create or submit any articles for review or publication. Rather, Northwestern, through its employee and/or agent Protess, improperly used the journalism students, in this case and others, as pawns to deflect public scrutiny from the blatantly illegal and unethical investigative techniques routinely employed by Northwestern's employees and/or agents to generate statements from witnesses without regard to the truth or falsity of those statements.

7.      Acting as Northwestern's employee and/or agent, Protess' use of this strategy was pervasive and well known to, and endorsed, encouraged and ratified by, Northwestern in order to garner national recognition to, and enhance the reputation of, its Medill School of Journalism, to attract the top high school and graduate students from across the country, and to further promote and enhance the University's fundraising activities.

8.      Northwestern's conduct permitted a culture of lawlessness to thrive in Protess' Investigative Journalism classes and investigations, which not only placed Northwestern's students at an alarming risk to their own safety, but also resulted in the crimes perpetrated against Simon.

9.      Although Plaintiff has now been exonerated, he will never regain the decade and a half lost of his life.  This lawsuit seeks redress for those injuries.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000.  28 U.S.C. §1332.

11.      Venue is proper pursuant to 28 U.S.C. §1391(b), because Defendants reside in the Northern District of Illinois and the events giving rise to the claims occurred in this district.

## THE PARTIES

12.      Plaintiff Alstory Simon ("Simon") is 64 year-old resident of the State of Ohio. From 1983 until February 1999, Simon lived and worked in Milwaukee, Wisconsin. From February 1999 until October 30, 2014, Simon was in the custody of the Sheriff of Cook County, Illinois and the Illinois Department of Corrections.

13.      Defendant Northwestern University ("Northwestern") is a private research university with its main campus in Evanston, Illinois. Northwestern consists of twelve schools

and colleges, including the Medill school of Journalism ("Medill"), which offers both undergraduate and graduate degrees.

14.     Defendant David Protess ("Protess"), at all relevant times, was a professor employed by Northwestern in its Medill School of Journalism. Protess taught an Investigative Journalism class during which he supervised and conducted criminal investigations with private investigators and his students into what he described as "wrongful convictions."

15.     At all relevant times, Protess was acting as an employee and agent of Northwestern, and was further acting within the scope of his employment with Northwestern. Protess is a resident of the Northern District of Illinois.

16.     Defendant Paul J. Ciolino ("Ciolino"), at all relevant times, was an investigator hired by Northwestern and Protess to teach the students investigation techniques and assist in investigations conducted by Northwestern through Protess and his Medill journalism class.

17.     At all relevant times, Ciolino was acting as an employee and agent of Northwestern and Protess, under the supervision and at the direction of Northwestern and Protess, and was further acting within the scope his employment as a private investigator and teacher for Northwestern.

18.     Ciolino's website states that he is an "adjunct lecturer at the Medill School of Journalism at Northwestern University in Evanston, Illinois." Ciolino is a resident of the Northern District of Illinois.

19.     Defendant Jack P. Rimland ("Rimland"), at all relevant times, was an attorney licensed to practice law in the State of Illinois. At all times relevant herein related to his involvement in the prosecution of Plaintiff, Rimland was acting as the agent of Protess and Ciolino. Upon information and belief, Rimland is a resident of the Northern District of Illinois.

**THE RISE OF DAVID PROTESS**

20.     In 1981, David Protess joined the faculty of Northwestern's Medill School of Journalism. Protess had previously worked as a research director at the Better Government Association and as a political science instructor at Loyola University of Chicago.

21.     During the 1980's, while employed at Northwestern, Protess also worked as a contributing editor and staff writer at the investigative monthly Chicago Lawyer magazine.

**The David Dowaliby Case**

22.     In 1990, with Northwestern's knowledge and approval, Protess and Rob Warden began investigating the case of David Dowaliby, who had been convicted of murdering his seven-year old adopted daughter.

23.     With Northwestern's knowledge, approval and ratification, Protess used Medill journalism students in conducting his investigation into the Dowaliby case.

24.     In July 1990, the Chicago Tribune published a two-part series authored by Protess based on interviews with David and Cynthia Dowaliby. Based in large part on Protess' and Warden's investigation, Dowaliby's conviction was subsequently overturned.

25.     Protess and Warden wrote a book about the Dowaliby case entitled "Gone In The Night."

26.     In 1996, CBS aired a two-part made-for-TV movie about the case, also entitled "Gone In The Night."

27.     Protess' work on the Dowaliby case, and the ensuing book and movie, enhanced the reputation, prestige and popularity of Northwestern and its Medill School of Journalism. After the Dowaliby case, Plaintiff is informed and believes that Protess, with the encouragement, endorsement and approval of Northwestern, converted the Medill Investigative Journalism class

into a vehicle to manufacture cases establishing innocence in order to exonerate allegedly wrongfully convicted individuals.

### The Ford Heights Four Case

28.     In 1996, Protess' Medill Investigative Journalism class, with the knowledge and approval of Northwestern, began investigating the case of four men known as the "Ford Heights Four."

29.     Northwestern hired defendant Paul Ciolino to assist Protess and the Medill students with the investigation.

30.     In July 1996, the Ford Heights Four were exonerated, heaping additional praise, recognition, and prestige upon Northwestern's Medill School of Journalism.

31.     In August of 1996, Protess signed a contract to write a book about the case. That book was ultimately published in 1998 and was entitled "A Promise Of Justice."

32.     During Northwestern's investigation, Protess and Ciolino engaged in certain improper, unethical and deceptive tactics, and caused Northwestern journalism students to do the same, in order to cause the release of the four individuals whom Protess and Ciolino believed to be wrongfully convicted.  For example:

   a.    On March 14, 1996, Protess wrote a letter to a key eyewitness on Medill School of Journalism letterhead advising that the witness had "monetary rights to [his] story," but only if he described his observations consistently with Northwestern's view of the case, and that if he did not act quickly, Protess' book and the ensuing movie about the case would go forward without him;

   b.    On March 13, 1996, Protess left a note on the front door of that same witness advising him to contact Protess about something that "should be helpful <u>financially</u>." (emphasis in original);

   c.    In a meeting at a Kentucky Fried Chicken restaurant in Kankakee, Illinois, defendant Ciolino, in Protess' presence and with his consent and approval, donned a sharkskin suit and falsely portrayed himself to the same key

eyewitness as Hollywood producer Jerry Bruckheimer working on a movie about the case in order to suggest to the witness that he could reap huge financial rewards for his story;

d.     During that same meeting, defendant Ciolino gave the same eyewitness $80 for meeting with Northwestern;

e.     Protess, Ciolino and Northwestern Medill students repeatedly attempted to get the eyewitness to change his testimony, with Protess offering him $250,000 and 20% in "upfront" money for his rights in a book and movie deal;

f.     Protess also told the eyewitness that he could have sex with either of two Northwestern Medill students if he would change his testimony.

33.     Protess wrote about some of these deceitful and unethical techniques in his 1998 book "A Promise Of Justice." For example, in describing Protess and Ciolino's meeting at the Kentucky Fried Chicken with the key eyewitness, Protess wrote:

> On March 15, Charles McCraney's appearance was anxiously awaited at a Kentucky Fried Chicken in Kankakee, Illinois. Paul Ciolino's hair was slicked back. The private investigator wore a sharkskin suit and white-on-white shirt with gold cuff links, his tie secured by an ornate pin. Sitting opposite him were David Protess and Rene Brown, dressed down for the occasion. McCraney, after receiving Protess's hand-delivered note, had called and promised to be there, but he was already two hours late. The trio was about to give up when in he walked. Protess introduced himself and then Brown. 'And this is Jerry Bruckheimer, the Hollywood producer I was telling you about,' said Protess as Ciolino extended his hand. 'Please have a seat Charlie,' said Ciolino. McCraney did as he was told. 'Here's the deal, Charlie,' Ciolino said. 'If you're willing to tell your story, it could be worth something.' 'How 'bout startin' by payin' for my time?' said McCraney, claiming he'd interrupted his workday to be there. Ciolino pulled out a gold money clip, peeled off four crisp twenties, and tossed them on the table. 'Whatcha wanna know?' McCraney inquired, pocketing he cash.

"A Promise Of Justice."

34.     Northwestern's investigation also included using female students to sexually flirt with prisoners/witnesses in an effort to get those witnesses to say what Northwestern wanted them to say.  Protess also writes about this shameful and manipulative technique in his book, describing how witness Ira Johnson wrote a letter to female Medill Journalism student:

Picking up the pile, [Protess] spotted a white envelope addressed, in his care, to Stacey. It was from Ira Johnson, who'd scrawled 'SWAK' – sealed with a kiss – on the back. Protess tore open the letter. 'Hello beautiful,' it began. After wishing her well, Johnson got to the point: 'I really had a nice time with you and Laura and I *did* have things to talk about, but I'm not going to get myself in that shit.' However, a few lines later, he seemed to have a change of heart: 'Maybe you *will* get the opportunity to hear what you been wanting to hear.' Johnson explained why: 'I couldn't get you off my mind, all I could think about was your bedroom eyes-they are very, very, very sexy looking . . . Stacey, you are one sexy-ass woman to be a white girl.' If she returned for another visit, he promised, 'it well may be worth your time.'

"A Promise Of Justice."

35.     Ira Johnson had written a similar letter to a second female Medill student. Johnson requested to meet with the female students again and to take a photo with them. In his book, Protess wrote: "But [the female students] should discuss it with their families and friends, and Protess needed to talk it over with the dean." "A Promise Of Justice."

36.     In "A Promise of Justice," Protess also described how Ciolino taught the Medill students a "Ghetto 101" Class, writing as follows: "Ghetto 101: That's how Paul Ciolino characterized a briefing *he'd been giving for years* to prepare David Protess's upscale students to conduct interviews in downscale neighborhoods." (emphasis added). "A Promise Of Justice." Ciolino taught the Medill students the "Ghetto 101" class at the Northwestern campus.

37.     The book continues: "Ciolino, a street-smart private detective who'd worked with Protess and Rob Warden on several cases, always began by discussing safety ('Go before the gang bangers wake up and wear running shoes') and ways to get a foot in the door ('Say that you've only got one quick question or that your grade depends on them talking to you'). "A Promise Of Justice."

38.     In the "Acknowledgements" chapter of "A Promise Of Justice," Protess specifically recognized "Professor Abe Peck, former acting Dean of Medill, and Professor Fay

Cook, director of Northwestern's Institute for Policy Research, whose support made this project possible." "A Promise Of Justice."

39.     Through the massive publicity surrounding the Ford Heights Four case, and the publishing of "A Promise of Justice," Northwestern became aware of Protess' and Ciolino's deceitful and unethical investigatory tactics.

40.     Northwestern knowingly approved, encouraged and ratified Protess' and Ciolino's deceitful and unethical conduct because Northwestern wanted to continue to reap the benefits, both in terms of prestige and financial gains, from Protess, Ciolino and the students exposing alleged "wrongful convictions." Indeed, the exoneration of the Ford Heights Four garnered international media attention upon Northwestern and its Medill School of Journalism.

41.     In addition to and/or as a result of the actual knowledge of Protess and Ciolino's unethical, deceitful and/or illegal conduct, in 1997, Michael Janeway, then Dean of the Medill School of Journalism, expressed concerns to Northwestern over the lack of oversight and supervision of Protess and Ciolino and a desire to cancel Protess' Investigative Journalism classes.

42.     Rather than act on Dean Janeway's valid and alarming concerns, Northwestern, in conscious disregard for the consequences of Protess' and Ciolino's conduct and misuse of the Medill classes and students, replaced Dean Janeway with Ken Bode, a Dean that would support and/or ignore Protess' and Ciolino's unethical, deceitful and/or illegal conduct.

43.     Northwestern made this decision based on the prestige and financial benefits it was reaping from Protess and Ciolino's alleged "investigations."

44.     A Daily Northwestern article dated May 23, 2000, described Dean Bode as keeping Protess from leaving Northwestern and quoted Bode as helping to "keep David Protess in business."

45.     On May 4, 1998, Northwestern's Institute for Policy Research held a panel discussion of the Ford Heights Four case, moderated by Protess, entitled "The Loss Of Innocence: When Journalists and Juries Get It Wrong."

46.     On or about June 10, 1998, Protess prepared a paper entitled "Detachment vs. Involvement in Doing Investigative Reporting with Students on Miscarriages of Justice."

47.     In September 1998, Medill Dean Ken Bode moderated a Northwestern panel discussion of the Ford Heights Four case.

48.     Through all of this activity, again, Northwestern became aware of Protess' and Ciolino's deceitful and unethical investigatory techniques but, rather than putting an end to these techniques, encouraged Protess to continue to employ these techniques in the hopes that Protess would continue to exonerate allegedly wrongfully convicted individuals and continue to heap praise, recognition and monetary benefits upon the University.

49.     Indeed, in August 1998, it was announced that the Robert R. McCormick Tribune Foundation had made a $20,000,000 grant to the Medill School of Journalism.

50.     Years later, when Protess "resigned" from Northwestern, a June 13, 2011 Chicago Tribune article stated "After years of promoting Protess' work and using it in a fundraising brochure, the university's announcement Monday said notably little."

**THE ANTHONY PORTER CASE**

51.     It was against this backdrop, and in this context, that in late 1998 (the same year "A Promise Of Justice" was published), Northwestern, through Protess' Investigative Journalism

class, began investigating the case of Anthony Porter, who had been convicted of a double-murder in 1983.

52.     Several Medill students were assigned to work on the Porter case over the course of two quarters.  The Medill journalism students who participated in the investigation of Porter's case were working under the supervision, and at the direction, of Northwestern, through Defendant Protess.

53.     Northwestern was aware of, encouraged and approved Protess using the Medill Investigative Journalism class to investigate the Anthony Porter case.

54.     Northwestern was also aware that Protess was again using private investigator Ciolino and the Medill students to conduct an alleged criminal investigation and that it was likely that the investigation would employ deceitful, unethical and illegal tactics, as Protess and Ciolino had employed in the Ford Heights Four case.

55.     Northwestern knowingly approved, encouraged and ratified Protess' and Ciolino's deceitful and unethical conduct in order to continue to reap the benefits, both in terms of prestige and financial gains, from Protess, Ciolino and the students exposing alleged "wrongful convictions."

56.     In his sworn deposition testimony in the Anthony Porter civil lawsuit, Ciolino testified that Protess would hire him to find people and "the university would pay for it." Plaintiff is informed and believes that Northwestern also paid Ciolino in the form of an "honorarium" for his services.

57.     As he did in the Ford Heights Four case, Ciolino taught the Medill students the "Ghetto 101" class, and also instructed the students on how to interview witnesses, including the

"good cop/bad cop" technique. Ciolino taught the Medill students these classes at the Northwestern campus.

58.     In his March 11, 1999 grand jury testimony, Ciolino testified that "my first involvement was teaching a class at Northwestern late last year with regards to how kids should conduct themselves while they are in prisons, jails and bad neighborhoods in the city." Ciolino further testified that he taught this class at Northwestern at the request of Professor Protess.

59.     Northwestern was also aware, and approved and endorsed the fact, that Protess and the Medill students were not really engaging in journalism, but, rather, would be acting as advocates for Porter, trying to prove his innocence, regardless of the truth. Northwestern was also aware, and approved the fact that, the Medill students would not be writing or publishing any articles on the case, as would be the case in a true journalism case.

60.     As discussed further herein, Northwestern's investigation led to Porter improperly being released from prison and Plaintiff Alstory Simon unlawfully being charged with the crime.

61.     The Anthony Porter case has been credited with convincing former Illinois Governor George Ryan to declare a moratorium on the death penalty in Illinois.

62.     Like the David Dowaliby and Ford Heights Four cases, the Anthony Porter alleged exoneration received international media attention, heaped enormous favorable and invaluable prestige and popularity upon Northwestern and the Medill School of Journalism, and enhanced Northwestern's national reputation, student recruiting, and fundraising efforts.

**The Murders**

63.     In the early morning hours on August 15, 1982, Jerry Hillard and Marilyn Green were shot and killed in the bleachers of the Washington Park swimming pool on the southeast side of Chicago.  Hillard was shot twice in the head; Green was shot twice in the neck and once

in the hand.

64.     Hillard was found by members of the Chicago Police Department alive, but unconscious, in the bleachers where he had been shot. Green staggered out of the bleacher area wounded and in critical condition when she was located by Chicago police officers approximately one block away. Both were rushed to the hospital but succumbed to their injuries.

### Eyewitnesses Identify Anthony Porter

65.     Upon arrival at Washington Park, Chicago police officers promptly located two witnesses to the murders, Henry Williams and William Taylor.

66.     Williams told police he was swimming and upon exiting the pool, was confronted by Anthony Porter who he knew from the neighborhood. Porter pointed a handgun at Williams's head and demanded money. Porter then walked into the bleachers where Hillard and Green were sitting, after which Williams heard several gunshots.

67.     Taylor told police he was in the swimming pool at the time of the shooting and heard gunshots. He did not initially identify the shooter but later that morning told the police he had seen Anthony Porter shoot the two victims in the bleachers. Taylor also told the police he did not want to be involved because he was afraid of Porter and his brothers, whom were well known in the neighborhood for being extremely violent.

68.     Chicago police detectives contacted the Cook County State's Attorney's Office's Felony Review Unit and Assistant State's Attorney ("ASA") David Kerstein responded to Area 1 to participate in additional interviews of Williams and Taylor.

69.     ASA Kerstein accompanied Williams, Taylor and Chicago police detectives to the scene of the shootings. In the presence of ASA Kerstein, Williams and Taylor again explained what they had seen and reiterated their identifications of Porter.

13

70.     While at the park with Williams and Taylor, ASA Kerstein and police detectives located two additional witnesses who stated they were also in the swimming pool area at the time of the shooting. One of those witnesses, Kenneth Edwards, told police and ASA Kerstein that he saw Anthony Porter, who he also knew from the neighborhood, shoot both victims in the bleachers.

71.     ASA Kerstein thereafter approved felony murders charges against Porter.

**Porter Is Arrested**

72.     After hiding out for several days, Porter surrendered to Chicago police. On September 9, 1982, Porter was arraigned on an indictment charging him with the murders of Hillard and Green, the armed robbery of Williams, and other lesser charges.

73.     At the time of his arrest, Porter was also wanted for shooting Earl Lewis in the head two weeks before the Hillard/Green murders, on August 1, 1982. That shooting took place at 56th and Michigan, a few blocks from Washington Park. Porter later plead guilty to that shooting and was sentenced to six years in prison.

**Porter Is Convicted**

74.     In September 1983, Taylor testified at Porter's criminal trial that Porter, who he knew from the neighborhood and saw frequently, fired the shots that killed Hillard and Green.

75.     Williams testified that Porter robbed him at gunpoint and then went into the bleachers and put a gun on a man sitting with a woman. Williams testified he knew Porter from the neighborhood and had seen him almost daily over the prior year and a half.

76.     Chicago police officer Anthony Liace testified that he stopped and frisked Porter near the bleachers of Washington Park immediately after the shooting. That testimony contradicted Porter's assertion, which he maintains to this day, that he was nowhere near

Washington Park on the night of the murders.

77.     Porter did not testify, but his friend Kenneth Doyle falsely testified that he and Porter were not in Washington Park at the time of the shooting but, rather, were drinking at Porter's mother's house until around 2:00 a.m., and then went to a nearby playground where they drank and got high until around 9:00 a.m.

78.     On September 7, 1983, the jury found Porter guilty of the murders of Hillard and Green, and the armed robbery of Williams.

79.     On September 21, 1983, Porter was sentenced to death for the murders of Hillard and Green. Porter was also sentenced to thirty (30) years for the armed robbery of Williams.

### Northwestern Creates False Evidence
### Against Simon As Part Of A Scheme To Free Porter

80.     In late 1998, with an execution date for Porter approaching, Protess, Ciolino, and Medill journalism students ("the Northwestern Team") began to investigate Porter's case as part of Protess' Medill Investigative Journalism class.  The Northwestern Team first focused on Porter's mental competence to be executed but, shortly thereafter, Defendants Protess and Ciolino formulated a plan to fabricate evidence that would exonerate Porter for the murders. Under the direction and supervision of Protess and Ciolino, the students began to investigate Porter's conviction and locate evidence that would establish that Porter was innocent.

81.     To claim Porter's innocence, Defendants Protess and Ciolino needed an alternate suspect.  Though Simon's name was never  mentioned by a single person to police or at Porter's criminal trial, Defendant Protess found references to Simon in old affidavits submitted during Porter's original post-conviction proceedings and promptly announced, in early November 1998, before any investigation was undertaken or any evidence developed, that he was almost certain Simon committed the murders.

15

82.     Thereafter, over the course of seven weeks, Defendants Protess and Ciolino, with the participation of Protess' students, knowingly manufactured and fabricated four pieces of false evidence which they contended dismantled the case against Porter and proved that Simon committed the murders.

83.     First, in December 1998, Defendant Ciolino coerced eyewitness William Taylor and misrepresented the crime scene in order to convince Taylor he could not have seen the murders from his vantage point in the pool area. Ciolino prepared a handwritten affidavit for Taylor to sign which deliberately omitted Taylor's critical statements to Ciolino and a Medill student that he *did* see Porter run right past him out of the bleachers where the murders occurred immediately after the shootings and that there was no doubt in his mind that Porter was guilty of the murders.   Protess was told of Taylor's statements to Ciolino and the Medill student implicating Porter and knew that those statements were intentionally omitted from the affidavit.

84.     A few days later, Protess also met with Taylor and, with the assistance of Ciolino, convinced Taylor to sign a second typed affidavit.  The second affidavit prepared by Protess and Ciolino also intentionally omitted Taylor's statements that he saw Porter run past him out of the bleachers after the shooting and that Taylor was sure that Porter was responsible for the murders.

85.     Defendants Protess and Ciolino provided Taylor's statement exclusively to CBS-TV. Protess falsely stated on its ensuing public broadcast that Taylor was the "only eyewitness" against Porter and that his "recantation" meant that "there is now no evidence against Anthony Porter."  In fact, the Northwestern Team never made any effort to interview any of several other witnesses who had identified Porter as either the shooter or being present at the murder location.

86.     Protess' media blitz publication of Taylor's coerced affidavit, along with the misrepresentations and fabrications by omissions made by Protess, was an intentional effort to

16

create a public sentiment, built on falsehoods of Porter's innocence, in order to influence the prosecuting authorities to free Porter.

87.     Second, after receiving his name from Porter, Protess sent a letter to Walter Jackson ("Jackson") in the Illinois Department of Corrections requesting that Walter Jackson call him.  A few days later, Protess talked to Walter Jackson on the phone at which time Protess made Jackson a number of promises in order to cause Jackson to sign a false affidavit (dated January 20, 1999) in which Jackson claimed that Simon had told him 17 years earlier that he shot Hillard and Green.

88.     Protess also used promises of money and freedom to get Jackson to call his aunt and Simon's estranged wife, Inez Jackson Simon ("Inez"), and convince her to help Protess free Porter from jail.  At Protess' instruction, Walter Jackson contacted Inez and related Protess' promises.

89.     Third, on January 29, 1999, Defendants Protess and Ciolino and two Medill students, visited Inez in Milwaukee, Wisconsin, and coaxed and induced Inez to make  an obviously false statement which was blatantly inconsistent with several key known facts, wherein Inez claimed she was with Simon when he shot Hillard and Green in Washington Park. Protess and Ciolino convinced Inez to help them free Porter and give a false statement implicating Simon by promising Inez money and the release of her nephew and son from jail.

90.     As he did with Taylor's statement, Protess immediately delivered Inez's statement to CBS-TV and appeared with her on television to announce Simon's guilt for the murders, and Porter's innocence.   As with his publication of Taylor's misleading affidavit, Protess' intent in publishing Inez's false statement to the media was to create a public sentiment, built on falsehoods, in order to influence the prosecuting authorities to prosecute Simon for the murders

and free Porter.

91.    Fourth, in furtherance of their goal to frame Simon, Protess and Ciolino pursed a campaign to compel a false confession from Simon for the murders.  In December of 1998, Protess sent two of his female students to Simon's house to interview him.

92.    The fact that Protess allowed two female students to enter the house, alone, of the person Protess believed may have committed a double-homicide demonstrates his own knowledge that there was no evidence that Alstory Simon had committed a violent crime.

93.    After the students left Simon's house, Protess confronted Simon and accused him of the murders.  Then, when those tactics were unsuccessful, Protess sent Ciolino to force a confession from Simon.  In the early morning of  February 3, 1999, Ciolino, with the knowledge and/or at the direction of Protess, illegally impersonated a police officer and, while armed with a handgun, entered Simon's house, illegally detained Simon, and knowingly obtained a false confession from Simon to the murders through the use of threats, fabricated evidence, false statements, promises, money, and other illegal tactics.  To wit:

a.    Ciolino and a fellow private investigator "bull rushed" (in the words of Ciolino) Simon in his home with their guns drawn;

b.    Ciolino told Simon that he was a police officer;

c.    Ciolino showed Simon a videotape of a man, who is now known to be an actor, falsely claiming that he saw Simon commit the murders;

d.    Ciolino threatened Simon that they could do things the "easy way or the hard way" and mentioned that he would hate to see Simon have an accident;

e.    Ciolino showed Simon what Ciolino described as a "devastating" five minute CBS-TV broadcast of Protess and Inez claiming Simon committed the murders;

f.    Ciolino falsely told Simon that he was facing the death penalty and that the Chicago police were on their way to Simon's house to arrest him;

g.   Ciolino told Simon he could avoid the death penalty by providing a statement that he shot the victims in self defense but that Simon had to act quickly because Ciolino could no longer help him once the police arrived;

h.   Ciolino promised Simon that he would be provided a free lawyer if he agreed to give a statement;

i.   Ciolino promised Simon that Protess would ensure he received a short prison sentence if he agreed to give a statement;

j.   Ciolino promised Simon would receive large sums of money from book and movie deals about the case if he agreed to give a statement.

94.   Believing he had no other viable option, and acting under extreme duress and the influence of narcotics, Simon was knowingly and intentionally coerced into providing a false statement implicating himself in the murders.

95.   With Protess' knowledge and approval, Ciolino wrote out a statement that he wanted Simon to make falsely implicating himself in the murders. Ciolino had Simon rehearse the statement so that it appeared legitimate and then Ciolino videotaped Simon giving the knowingly false statement wherein Simon falsely stated that he shot Hillard in self-defense and shot Green by accident. Like Inez's statement, Simon's confession made no sense in light of the known facts of the crime.

96.   As with Inez's statements, Protess promptly provided the videotape to CBS-TV, whose exclusive broadcast of Simon's confession was followed by a local and national media "frenzy" declaring Simon's guilt and Porter's innocence. Protess' intent in releasing Simon's false confession first to the media, instead of to the prosecuting authorities, was to create a massive public sentiment that Porter was innocent of the murders in order to improperly influence the prosecuting authorities to free Porter and prosecute Simon for the murders.

97.   Defendants Northwestern, Protess and Ciolino knowingly provided the false

evidence purporting to exonerate Porter to the State's Attorney's Office.

### Northwestern Retains Rimland To
### Conceal Its Framing Of Simon

98.     Immediately upon coercing Simon's false confession, Defendant Ciolino arranged for his friend, attorney Jack Rimland, to "represent" Simon for free. Ciolino and Rimland shared office space and Rimland had previously defended Ciolino when he was charged with threatening to shoot a witness during an investigation.

99.     In reality, Defendant Rimland never represented Simon's interests. Rather, Rimland agreed to represent Simon in order to assist the Northwestern Team in its goal of obtaining the release of Porter and the conviction of Simon.   Northwestern's procurement of Rimland, through its employees and/or agents Protess and Ciolino, was a deliberate and intentional move to fraudulently conceal the falsity of Simon's confession and the witness statements that Northwestern had procured.

100.    On February 4, 1999, Rimland stated publicly that "obviously if [Simon] is charged, he's looking at the death penalty." Rimland's statement served no purpose other than to continue to scare Simon with the threat of the death penalty.

101.    On February 5, 1999, based on the false confession of Simon obtained by Ciolino and Protess, the State's Attorney's Office agreed to release Porter from custody..

102.    The next day, on February 6, 1999, based solely on the false evidence that was manufactured by the Northwestern Team, Simon was charged with the murders and subsequently placed under arrest.

### The Grand Jury

103.    In February and March, 1999, several witnesses including Defendants Protess and Ciolino, and several Medill students, testified before a grand jury about their investigation into

Porter's case, and the evidence that the Northwestern Team manufactured against Simon.

104.   From February 9, 1999, just days after Simon was arrested and Porter was released, through February 17, 1999, four other independent and unbiased witnesses to the murders, Kenneth Edwards, Eugene Beckwith, Mark Senior, and Michael Woodfork, also testified before the grand jury

105.   All four of those independent witnesses testified that they had gone to the pool together and were in the pool area at the time of the murders. All four of those witnesses testified that they saw a small group of four to five people in the precise location of the murders just prior to shots being fired. Three of the four witnesses, Senior, Beckwith, and Edwards, testified that Anthony Porter, who they all knew from the neighborhood, was one of those people.  None of those four witnesses ever identified or implicated Simon.

106.   One of the witnesses, Kenneth Edwards, specifically testified that it was Anthony Porter who shot the victims. In fact, when Kenneth Edwards testified that the person who was with Porter when he shot the victims could not have been Simon, a grand juror asked "why would Simon say he did it now when he didn't say it then"?  Edwards responded: "Your guess is as good as mine. It just makes me laugh that the situation is the way it is now."

107.   Though all four of those witnesses were prominently referenced in Chicago police reports from the original 1982 murder investigation, the Northwestern Team did not make any effort to locate and/or interview any of them.

108.   Three months after these witnesses testified to the grand jury, on May 7, 1999, Defendant Rimland, while purporting to represent Simon, presented awards to Defendants Protess and Ciolino, and five Medill students on behalf of the Illinois Attorneys for Criminal Justice for their actions in freeing Porter and developing evidence against his client, Simon. In

presenting these awards, Rimland stated: "David Protess and his students utilized their talents as investigative journalists and successfully uncovered crucial evidence resulting in the freeing of Anthony Porter."

109.    The grand jury was disbanded without being asked to return an indictment against Simon.

110.    In March of 1999, a new grand jury was empanelled and on March 24, 1999, based solely on the false evidence manufactured by the Northwestern Team, Simon was indicted for the murders.

111.    In order to further their objective of falsely portraying Porter as an innocent death row inmate and concealing that Simon's confession was false, Protess, Ciolino, and Rimland agreed to collaborate in order to obtain the conviction of Simon.

112.    In furtherance of their agreement, Rimland, in concert with Protess and Ciolino, coerced Simon into pleading guilty to the murders by lying to Simon about the evidence in the case, concealing the overwhelming eyewitness grand jury testimony implicating Porter, threatening Simon with the death penalty if he did not plead guilty, and lying to Simon that he was going to be charged with other crimes if he did not plead guilty.

113.    At no time during his representation of Simon, from the time of Simon's arrest through his plea of guilty seven months later, did Rimland ever tell Simon about the explosive grand jury testimony further inculpating Porter-and exculpating Simon-in the murders.

114.    Further, Rimland never told Simon that, in February, 1999, William Taylor, the single witness whom the Northwestern Team had publicly portrayed as having recanted his testimony against Porter, provided a sworn court-reported statement. In that statement, Taylor swore that immediately after the shots were fired, he looked into the bleachers, and saw a man

who looked like and who he believed was Anthony Porter run out of the bleachers right past Taylor with a gun in his hand. Despite Simon's innocence, and the obvious deficiencies in the case against him, Rimland continuously told Simon his case was indefensible and he had no choice but to accept a plea deal.

115.    On September 7, 1999, at Rimland's behest and a direct result of the above conduct of Rimland, Protess, and Ciolino, Simon plead guilty to the murder of Green and the voluntary manslaughter of Hillard. He was sentenced to concurrent terms of thirty-seven (37) years for murder and fifteen years (15) for voluntary manslaughter.

### The False Evidence Against Simon Unravels

116.    In 2001, after finally receiving the Grand Jury transcripts containing the evidence of Porter's guilt, Simon filed a *pro se* post-conviction petition proclaiming his innocence and describing how he had been coerced into confessing to the murders.

117.    That post-conviction petition was denied, but it set in motion an investigation that would take several years and would ultimately reveal that all of the evidence that the Northwestern team had gathered against Simon, which consisted solely of the statements of Walter Jackson, Inez, and Simon himself, was false and fabricated

118.    Specifically, in January, 2006, Walter Jackson admitted that Simon never told him that he committed the murders, and explained that he provided the false statement because Protess promised Jackson, during a telephone conversation, that if he helped free Porter, and enlisted Inez's assistance, Protess would in turn help Jackson get out of prison. Protess also told Jackson there would be money waiting for him when he was released.

119.    In November 2005, Inez admitted that her statement implicating Simon was false and that she agreed to give the false statement because Protess had promised her money from

movie and book deals and to get her nephew and son released from jail.

120.     Inez repeated her admissions during a videotaped evidence deposition in the presence of a court reporter, Simon's defense attorney, and Cook County Assistant State's Attorneys, shortly before her death in early 2006. Inez testified she did not want to take her lies to her grave and wanted to tell the truth before she passed.

121.     Inez's daughter and sister also told investigators in 2003 that Inez had admitted she was only helping Porter because Protess promised to help get Walter Jackson out of prison, and because Protess had plied Inez, who suffered from debilitating alcohol and drug problems, with alcohol.  They also explained that it made no sense that Inez, who was open with them, would have concealed her presence at a double murder for 17 years, and then freely reveal that secret to people from Northwestern University whom she had never met.

122.     With respect to Simon's confession, and in addition to the coercion set forth above, Defendant Ciolino has since boasted publicly about forcing Simon to confess. Specifically, Ciolino stated publicly that "we bull-rushed him, and mentally he couldn't recover," and that "I don't have any rules, the Supreme Court says that I can lie, cheat, do anything I can to get him to say what I gotta get him to say."

### PLAINTIFF'S EXONERATION

123.     In October 2013, the Conviction Integrity Unit of the Cook County State's Attorney's Office announced, in response to a further submission from Simon's attorneys, that it would re-investigate the Hillard/Green murders. That comprehensive investigation would ultimately last over a year and involve the State's Attorney's Office interviewing over 100 witnesses.

124.     The investigation concluded on October 30, 2014, when the State's Attorney's

Office requested that the circuit court vacate the murder and voluntary manslaughter charges against Simon. Presiding Judge Paul Biebel vacated Simon's conviction and Simon was released from Jacksonville Correctional Center later that same day.

125. State's Attorney Anita Alvarez issued a press release explaining that "At the end of the day and in the best interests of justice, we could reach no other conclusion but that the investigation of this case has been so deeply corroded and corrupted that we can no longer maintain the legitimacy of this conviction."

126. Later that same day, the State's Attorney added, "this investigation by David Protess and his team involved a series of alarming tactics that were not only coercive and absolutely unacceptable by law enforcement standards, they were potentially in violation of Mr. Simon's constitutionally protected rights."

127. State's Attorney Alvarez further noted that the conduct of Protess and Ciolino in coercing Simon's statement may have constituted the crimes of obstruction of justice and witness intimidation but that these crimes were barred by the statute of limitations.

## PLAINTIFF'S DAMAGES

128. Plaintiff was imprisoned for over fifteen of his most productive years and now, at the age of sixty-four (64), he must attempt to reconstruct a life for himself from scratch. Plaintiff was stripped without warning of all of his personal relationships, belongings, goals, and aspirations, and during the ensuing 15 years, he was deprived of all of life's basic pleasures and offerings.

129. During that time, Plaintiff lost his mother, was unable to attend her funeral, and was unable to experience any joy or share life's joys with friends, family, and acquaintances. Plaintiff was deprived of the most basic human entitlement to move about freely as an

independent human being.

130.    Plaintiff suffered the continuing frustration and indignity of being labeled a cold blooded killer by the very Defendants and their supporters who were responsible for framing him, as those individuals scoffed at and ridiculed his exhaustive efforts to prove his innocence and expose their crimes.

131.    As a result, Plaintiff has endured and will continue to endure immense and immeasurable, emotional and physical, pain and suffering, all of which was proximately caused by Defendants' misconduct.

## THE FALL OF DAVID PROTESS

132.    Plaintiff is informed and believes that Medill Deans Michael Janeway, Ken Bode, and John Lavine all were likely informed by faculty, students and others that the work of Protess and the students did not conform to generally accepted journalistic standards but they took no action in response to those concerns.

133.    As described below, Defendant Northwestern's knowledge of, and deliberate indifference to, Defendants' misuse of its journalism students and classes continued unabated for more than a decade after Defendant Protess and his co-conspirators framed Simon for the murders, to wit:

a.      In 2004, a Medill student advised a Northwestern attorney that they intended to bring a female Medill student to a state prison as a "treat" for a key witness whose statement they were attempting to obtain in *People v. Serrano*;

b.      In 2004, Defendant Protess emphasized the importance of supplying the same witness with a lawyer who would dissuade the witness from worrying about any perjury implications of recanting;

c.      In 2004, Northwestern gave a key witness in *People v. McKinney* $40.00 to buy crack cocaine in in return for his statement (which the witness later recanted) and attempted to disguise the payment by using an unknowing

intermediary (a cab driver) to pay the witness. A Northwestern representative who falsely identified himself as a "detective" gave the driver $60.00 for a $6.00 ride, and told him to give the witness $40.00, and to keep "the change" after driving the witness to a gas station adjacent to a nearby crack house where he purchased crack cocaine;

d. The payment was only confirmed because the cab driver recorded it in his log out of concern that the transaction was part of a drug deal. The driver's log reflects that he logged the fare as $20.00 and refused to accept the $14.00 "tip" on the $6.00 fare because he was concerned it was "drug money".

e. According to that same witness's mother, students who came to her house looking for her son were accompanied by a man who stood by a car and scared her by flashing a shotgun while the students asked questions;

f. In 2004, an incarcerated witness in *Serrano* stated that he provided Northwestern with a statement in the case (which he later recanted and acknowledged was false), solely because several female Medill students visited him, and flirted with and flattered him. The witness stated that three female students visited him the first time and two female students visited him the second time, and he made up a story to keep the "pretty girls" around. The witness stated that the girls sent him cards and letters when he was released from prison;

g. A third witness in *People v. McKinney* has stated that he was given $50-$100 to meet with Northwestern, and that female students took him out for dinner and cocktails, and that one flirted with him aggressively in an effort to obtain a statement;

h. In 2006, while working under the supervision and with the approval of Defendant Protess, a Medill student working on the case of *People v. McKinney* impersonated a United States census worker in order to convince an Evanston man to provide location information about his nephew;

i. In 2008, a Medill student, acting with the approval of Defendant Protess, misrepresented herself as a person working with a newspaper reporter;

j. In 2009, a Medill student, acting with the approval of Defendant Protess, misrepresented herself as a Commonwealth Edison employee in another case to obtain address information about a witness in a dangerous neighborhood;

k.  In 2010, Medill students tried to convince a witness that his previous identification of a murderer was inaccurate by showing the witness a photo spread of six similar looking individuals;

l.  In 2010, Medill students bought alcohol for witnesses, on a frequent enough basis that some students expressed "particular concern [about] the partying" with witnesses. Defendant Protess acknowledged a policy of reimbursing students for their purchase of one drink for witnesses;

m.  In 2010, a Medill student writing about her experiences in an article titled "A bad-ass P.I. spices up the quest for truth," described a Northwestern investigator having her hide his loaded semi-automatic pistol in her purse as part of a practical joke about a pretend armed robbery;

n.  On multiple occasions, Medill students misrepresented themselves as attorneys to witnesses:

o.  Defendant Protess routinely and openly encouraged Medill students to use manipulation, trickery, and misleading information to cause witnesses to make statements.

134.  In 2003, Northwestern, through David Protess and the Medill Investigative Journalism class, began investigating the case of Anthony McKinney.

135.  In May 2009, the State's Attorney's Office served a subpoena on Northwestern requesting all of the students' case materials related to their investigation. In response, Northwestern sought to quash the subpoena, arguing that the Medill students were reporters and their materials were protected from production by the Illinois reporter shield law.

136.  In June 2010, Northwestern discovered that McKinney's attorneys had received copies of the students' memos and work product, even though Protess had falsely claimed the documents had not been shared outside of Medill. Further, Northwestern determined that Protess had deliberately tried to hide the fact that he had released the students' memos to McKinney's lawyers.

137.  On April 6, 2011, Northwestern issued a statement which stated, in pertinent part, that: "The review uncovered considerable evidence that Protess: authorized the release of all

student memos to Mr. McKinney's lawyers despite his repeated claims to the contrary; knew from the very beginning that doing so waived any claim of privilege; and repeatedly provided false and misleading information to the lawyers and the dean."

138.    The Northwestern statement noted that Protess had falsified an email on this issue, stating: "As just one example, in December 2009, Protess sent them a falsified communication in an attempt to hide the fact that the student memos had been shared with Mr. McKinney's lawyers. This communication included what Protess said was a copy of a November 2007 email, unredacted and save for removal of 'personal information,' that he had sent to his program assistant. The email copy he provided stated that: 'My position about memos, as you know, is that we don't keep copies. . . .' However, examination of the original 2007 email, which was only recently obtained by the University, revealed that the original wording actually was: 'My position about memos, as you know, is that *we share everything with the legal team*, and don't keep copies. . .'" (emphasis added).

139.    Northwestern's statement further stated: "In sum, Protess knowingly misrepresented the facts and his actions to the University, its attorneys and the dean of Medill on many documented occasions. He also misrepresented the facts about these matters to students, alumni, the media and the public. He caused the University to take on what turned out to be an unsupportable case and unwittingly misrepresent the situation both to the Court and to the State."

140.    Despite knowing that Protess had made numerous serious misrepresentations to the University, its attorneys, alumni, students and the media, and had altered a key email, Northwestern did not voluntarily terminate Protess' employment, as it should have, but instead permitted Protess to "resign" from the University.

**COUNT I**
**Malicious Prosecution**
**(Against All Defendants)**

141.     Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

142.     Northwestern, through it's employees and/or agents Protess and Ciolino, reached an agreement to do whatever what was necessary in order to obtain Porter's release, including manufacturing and fabricating evidence against Simon.

143.     In furtherance of the agreement, and as described above, Northwestern, through Defendants Protess and Ciolino, with the assistance of Medill journalism students, knowingly obtained false witness statements against Simon through the use of coercion and improper inducements, including, but not limited to, terrifying threats and promises of money and freedom from incarceration.

144.     Northwestern, through Protess and Ciolino, knowingly provided that false evidence to the State's Attorney's Office.

145.     Defendant Rimland agreed to participate with Defendants Northwestern, Protess and Ciolino in the scheme to obtain the release of Porter and the conviction of Simon, by actually representing the interests of Northwestern, Protess and Ciolino, rather than his own client, Simon.

146.     The implementation of this scheme was an intentional act of fraudulent concealment intended to ensure that the blatant fabrication and manufacturing of false evidence set forth above would never be scrutinized by, or revealed to, the Court.

147.     On or about February 7, 1999, based solely on the knowingly coerced false confession of Simon and the knowingly false witness statements that were fabricated and

manufactured by Defendants Northwestern, through its employees and/or agents Protess and Ciolino, Simon was arrested for the murders of Jerry Hillard and Marilyn Green.

148.     In March of 1999, based solely on the knowingly false confession of Simon and the knowingly false witness statements that were fabricated and manufactured by Northwestern, through Defendants Protess and Ciolino, the Cook County State's Attorney's office sought and obtained the indictment of Simon for the murders of Jerry Hillard and Marilyn Green.

149.     In order to further conceal their wrongdoing as described above, Defendants Northwestern, Protess, Ciolino, and Rimland agreed to collaborate in order to obtain the conviction of Simon.

150.     In furtherance of that agreement, Defendant Rimland, in concert with Defendants Northwestern, Protess and Ciolino, coerced Simon into pleading guilty to the murders by lying to Simon about the evidence in the case, concealing explosive eyewitness testimony implicating Porter, and threatening Simon.

151.     After Simon's conviction, Defendants continued to conceal their misconduct by making repeated false public statements and false statements to Cook County State's Attorney's Office representatives who were investigating Defendants' conduct in relation to the case against Simon.

152.     On October 30, 2014, the criminal charges against Simon were terminated in his favor in a manner indicative of his innocence when Cook County State's Attorney Anita Alvarez obtained the vacatur of Simon's conviction and dismissed the murder charges against Simon.

153.     Defendants accomplished an unlawful result through individual and concerted action in that they agreed, through explicit or implicit means, to falsely and maliciously initiate and continue the prosecution of Plaintiff for murder, without probable cause.

154.     In furtherance of their agreement, Defendants manufactured false evidence against Plaintiff, coerced Plaintiff into making a false confession to the murders, and coerced Plaintiff to plead guilty to crimes he did not commit.

155.     The criminal charges filed against Plaintiff were initiated and continued by Defendants maliciously.

156.     There was never any probable cause that Plaintiff committed the murders and the only evidence that was used to support the prosecution of Plaintiff was knowingly false and manufactured by Defendants Northwestern, Protess and Ciolino.

157.     As a proximate cause of Defendants' malicious prosecution of Plaintiff, Plaintiff has suffered, and will continue in the future to suffer, debilitating injuries of a personal, physical and pecuniary nature.

**COUNT II**
**Respondent Superior – David Protess**
**(Against Northwestern University)**

158.     Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

159.     At all relevant times herein, Protess was a journalism professor employed by, and acting as an agent of, Northwestern University.

160.     Northwestern had the right and ability to control the manner and means of Protess' work.

161.     As set forth herein, Northwestern was aware that Protess was using the Medill Investigative Journalism class and its students to "investigate" claims of wrongful convictions and to free prisoners who were allegedly wrongfully convicted.

162.    Northwestern was also aware that Protess was using investigator Ciolino as part of these alleged "investigations."

163.    Further, as set forth herein, Northwestern was aware of the fact that Protess and Ciolino were engaging in unethical, deceitful and/or illegal conduct as part of their investigations.

164.    Northwestern was aware of this misconduct and approved, encouraged, condoned and/or ratified this misconduct because Northwestern wanted to continue to reap the benefits of Protess' alleged exonerations in the form of additional prestige and favorable exposure to the Medill School of Journalism and financial benefits in the form of fundraising, student enrollment, and the University's overall ranking and reputation.

165.    The conduct Protess engaged in, as described throughout this Complaint, was the kind for which Protess was employed to perform by Northwestern and, again, Northwestern was aware of, and approved, condoned and/or ratified Protess' conduct.

166.    The conduct Protess engaged in, as described throughout this Complaint, was substantially within the authorized time and space limits.

167.    Moreover, the conduct Protess engaged in, as described throughout this Complaint, was actuated, in whole or in part, by a purpose to serve Northwestern, as described herein.

## COUNT III
### Respondent Superior – Paul J. Ciolino
### (Against Northwestern University)

168.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

169.    At all relevant times herein, Ciolino was an investigator employed by, and acting as an agent of, Northwestern University and David Protess. Ciolino has testified under oath that Northwestern has paid him for his services. Plaintiff is also informed and believes that Northwestern paid Ciolino in the form of an "honorarium" for his services.

170.    At all relevant times herein, Ciolino was an adjunct lecturer at the Medill School of Journalism.

171.    Northwestern and Protess had the right and ability to control the manner and means of Ciolino's work.

172.    As set forth herein, Northwestern was aware that Ciolino was working with Protess in the Medill Investigative Journalism class and was "investigating" claims of wrongful convictions on behalf of Northwestern. Northwestern was also aware that Ciolino was teaching classes to the Medill students, on Northwestern's campus, regarding interview techniques and how to conduct themselves while at prisons, jails and bad neighborhoods.

173.    As set forth herein, Northwestern was aware that Ciolino was engaging in unethical, deceitful, and/or illegal conduct as part of the Medill investigations.

174.    Northwestern was aware of this misconduct and approved, encouraged, condoned and/or ratified this misconduct because Northwestern wanted to continue to reap the benefits of Medill's alleged exonerations in the form of additional prestige and favorable exposure to the Medill School of Journalism and financial benefits in the form of fundraising, student enrollment and the University's overall ranking and reputation.

175.    The conduct Ciolino engaged in, as described throughout this Complaint, was the kind for which Ciolino was employed to perform by Northwestern and, again, Northwestern was aware of, approved, condoned and/or ratified Ciolino's conduct.

176. The conduct Ciolino engaged in, as described throughout this Complaint, was substantially within the authorized time and space limits.

177. Moreover, the conduct Ciolino engaged in, as described throughout this Complaint, was actuated, in whole or in part, by a purpose to serve Northwestern as described above.

**COUNT IV**
**Negligent Supervision – David Protess**
**(Against Northwestern University)**

178. Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

179. As described throughout this Complaint, prior to Protess' misconduct in relation to its investigation in the Porter case, Protess openly employed improper and unethical tactics, and caused Northwestern journalism students to do the same, in order to cause the release of individuals deemed to be "wrongfully convicted."

180. As a result of the facts sets forth herein, at the time of the Porter investigation, Northwestern's administration knew, or should have known, that as part of Medill's Investigative Journalism classes, and with the assistance of Ciolino and Northwestern students, Protess had utilized the tactics described herein, and that he demonstrated a pattern and practice of engaging in improper and illegal conduct in order to manipulate evidence to establish the "innocence" of certain convicted individuals.

181. At the time of the Porter investigation, Northwestern's administration knew, or should have known, that despite being portrayed as a "journalism" class, students in Protess' investigative journalism classes did not produce any journalism but, rather, acted as criminal

defense investigators advocating for defendants who had been deemed by Protess to have been "wrongfully convicted."

182.    In addition to and/or as a result of the actual knowledge of Northwestern's administration of the unethical conduct of Protess, in 1997, the then Dean of the Medill School of Journalism, Michael Janeway, expressed his concerns over the lack of oversight and supervision of Protess and his desire to cancel Protess' classes.

183.    Rather than act on Dean Janeway's valid concerns, the Northwestern administration, in conscious disregard for the consequences of Protess' conduct and misuse of his classes and students, replaced Dean Janeway with a dean that would support and/or ignore Protess' unethical and/or illegal conduct.    Northwestern made this decision based on the notoriety it was enjoying from Protess and Ciolino's "investigations."

184.    Despite their actual or constructive knowledge of Protess' pattern and practice of improper and unethical conduct, Northwestern deliberately overlooked that conduct and allowed Protess to continue teaching Investigative Journalism classes.

185.    Northwestern deliberately ignored Protess' conduct in order to continue to obtain notoriety, prestige, and financial benefits for the University.

186.    Despite having known of this improper conduct, Northwestern used Protess, his classes, and his investigations for fundraising and marketing purposes.

187.    At the time of the Porter investigation, Northwestern had knowledge, either actual or constructive, that by funding, supporting, and encouraging Protess' use of Medill journalism classes and students to engage in improper investigative conduct and to manipulate evidence to establish the "innocence" of convicted individuals, that it was reasonably probable that such conduct would result in the incarceration of an innocent person, such as Plaintiff.

188.    As set forth throughout this Complaint, Northwestern was aware of Protess' improper, deceitful and unethical conduct in conducting alleged "investigations" as part of his Medill Investigative Journalism classes.

189.    As set forth throughout this Complaint, Northwestern knew or should have known that Protess had a particular unfitness for his position, or was otherwise behaving in a dangerous and incompetent manner, so as to create a danger of harm to third persons such as Plaintiff.

190.    Consequently, at all relevant times herein, Northwestern University had a duty to supervise Protess and his Medill Investigative Journalism class activities and to safeguard Plaintiff against this foreseeable and likely harm.

191.    Northwestern was aware of the fact that Protess and his students were investigating the Anthony Porter case and were claiming that Plaintiff was the real perpetrator of the crimes at issue.

192.    Based on Protess' prior improper conduct and history, and Northwestern's knowledge of that improper conduct and history, Protess' investigation of the Anthony Porter case created a foreseeable risk of injury to Plaintiff, and there was a reasonable likelihood of such an injury, and Northwestern had a duty to protect Plaintiff from such an injury.

193.    Based on Protess' prior improper conduct and history, and Northwestern's knowledge of that improper conduct and history, Northwestern and Plaintiff stood in such a relationship to each other that Northwestern had a duty and obligation of reasonable conduct for the benefit of Plaintiff.

194.    Northwestern, by and through its duly authorized agents and/or employees, also had a duty to exercise ordinary care to guard against injuries which were probable and foreseeable consequences of its actions or failures to act.

195.    Northwestern negligently failed to supervise Protess adequately or take any action to prevent Protess, with the assistance of Northwestern students and investigators, from using coercive and threatening conduct to manufacture false witness statements and obtain false confessions in order to secure the release of convicted individuals.

196.    By failing to properly supervise Protess, as alleged herein, Northwestern breached its duties to Plaintiff.

197.    Northwestern's breach of its duties to Plaintiff was the proximate cause of Plaintiff's injuries.

198.    At all relevant times, Northwestern acted willfully and wantonly and with a deliberate intention to harm Plaintiff or with a conscious disregard for Plaintiff's welfare.

## COUNT V
### Negligent Supervision – Paul J. Ciolino
### (Against Northwestern University)

199.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

200.    As described throughout this Complaint, prior to Ciolino's misconduct in relation to its investigation in the Porter case, Ciolino openly employed improper and unethical tactics, and caused Northwestern journalism students to do the same, in order to cause the release of individuals he deemed to be "wrongfully convicted."

201.    As a result of the facts sets forth herein, at the time of the Porter investigation, Northwestern's administration knew, or should have known, that as part of the Medill Investigative Journalism classes, Ciolino had utilized the tactics described herein, and that he demonstrated a pattern and practice of engaging in improper and illegal conduct in order to manipulate evidence to establish the "innocence" of certain convicted individuals.

202.    At the time of the Porter investigation, Northwestern's administration either knew, or should have known, that despite being portrayed as a "journalism" class, students in Protess' investigative journalism classes did not produce any journalism but, rather, acted as criminal defense investigators advocating for defendants who had been deemed by Defendant Protess to have been "wrongfully convicted."

203.    In addition to and/or as a result of the actual knowledge of Northwestern's administration of the unethical conduct of Protess, in 1997, the then Dean of the Medill School of Journalism, Michael Janeway, expressed his concerns over the lack of oversight and supervision of Protess and his desire to cancel Protess' classes.

204.    Rather than act on Dean Janeway's valid concerns, the Northwestern administration, in conscious disregard for the consequences of Protess' conduct and misuse of his classes and students, replaced Dean Janeway with a dean that would support and/or ignore Protess' unethical and/or illegal conduct.   Northwestern made this decision based on the notoriety it was enjoying from Protess and Ciolino's "investigations."

205.    Despite their actual or constructive knowledge of Ciolino's pattern and practice of improper and unethical conduct, Northwestern deliberately overlooked that conduct and allowed Ciolino to continue working with Protess on Medill's Investigative Journalism classes.

206.    Northwestern deliberately ignored Ciolino's conduct in order to continue to obtain notoriety, prestige, and financial benefits for the University.

207.    Despite having known of this improper conduct, Northwestern used Protess, his classes, and his investigations for fundraising and marketing purposes.

208.    At the time of the Porter investigation, Northwestern had knowledge, either actual or constructive, that by funding, supporting, and encouraging Protess' and Ciolino's use of

Medill journalism classes and students to engage in improper investigative conduct and to manipulate evidence to establish the "innocence" of convicted individuals, that it was reasonably probable that such conduct would result in the incarceration of an innocent person, such as Plaintiff.

209.    As set forth throughout this Complaint, Northwestern was aware of Ciolino's improper, deceitful and unethical conduct in conducting alleged "investigations" as part of Medill's Investigative Journalism classes.

210.    As set forth throughout this Complaint, Northwestern knew or should have known that Ciolino had a particular unfitness for his position, or was otherwise behaving in a dangerous and incompetent manner, so as to create a danger of harm to third persons such as Plaintiff.

211.    Consequently, at all relevant times, Northwestern University had a duty to supervise Ciolino and his work with Protess' Medill Investigative Journalism class and to safeguard Plaintiff against this foreseeable and likely harm.

212.    Northwestern was aware that Protess, Ciolino, and the Medill students were investigating the Anthony Porter case and were claiming that Plaintiff was the real perpetrator of the crimes at issue.

213.    Based on Ciolino's prior improper conduct and history, and Northwestern's knowledge of that improper conduct and history, Ciolino's investigation of the Anthony Porter case created a foreseeable risk of injury to Plaintiff, and there was a reasonable likelihood of such an injury, and Northwestern had a duty to protect Plaintiff from such an injury.

214.    Based on Ciolino's prior improper conduct and history, and Northwestern's knowledge of that improper conduct and history, Northwestern and Plaintiff stood in such a

40

relationship to each other that Northwestern had a duty and obligation of reasonable conduct for the benefit of Plaintiff.

215.    Northwestern, by and through its duly authorized agents and/or employees, also had a duty to exercise ordinary care to guard against injuries which were probable and foreseeable consequences of its actions or failures to act.

216.    Northwestern University negligently failed to supervise Ciolino adequately or take any action to prevent Ciolino, with the assistance of Protess and Northwestern students, from using coercive and threatening conduct to manufacture false witness statements and obtain false confessions in order to secure the release of convicted individuals.

217.    By failing to properly supervise Ciolino, as set forth herein, Northwestern breached its duties to Plaintiff.

218.    Northwestern's breach of its duties to Plaintiff was the proximate cause of Plaintiff's injuries.

219.    At all relevant times, Northwestern acted willfully and wantonly and with a deliberate intention to harm Plaintiff or with a conscious disregard for Plaintiff's welfare.

**Count VI**
**Negligent Retention – David Protess**
**(Against Northwestern University)**

220.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

221.    As described throughout this Complaint, prior to Protess' misconduct in relation to its investigation in the Porter case, Protess openly employed improper and unethical tactics, and caused Northwestern journalism students to do the same, in order to cause the release of individuals deemed to be "wrongfully convicted."

222.    As a result of the facts sets forth herein, at the time of the Porter investigation, Northwestern's administration knew, or should have known, that as part of his journalism classes, and with the assistance of Ciolino and Northwestern students, Protess had utilized the tactics described herein, and that he demonstrated a pattern and practice of engaging in improper and illegal conduct in order to manipulate evidence to establish the "innocence" of certain convicted individuals.

223.    At the time of the Porter investigation, Northwestern's administration knew, or should have known, that despite being portrayed as a "journalism" class, students in Protess' investigative journalism classes did not produce any journalism but, rather, acted as criminal defense investigators advocating for defendants who had been deemed by Protess to have been "wrongfully convicted."

224.    In addition to and/or as a result of the actual knowledge of Northwestern's administration of the unethical conduct of Protess, in 1997, the then Dean of the Medill School of Journalism, Michael Janeway, expressed his concerns over the lack of oversight and supervision of Protess and his desire to cancel Protess' classes.

225.    Rather than act on Dean Janeway's valid concerns, the Northwestern administration, in conscious disregard for the consequences of Protess' conduct and misuse of his classes and students, replaced Dean Janeway with a dean that would support and/or ignore Protess' unethical and/or illegal conduct.    Northwestern made this decision based on the notoriety it was enjoying from Protess and Ciolino's "investigations."

226.    Despite their actual or constructive knowledge of Protess' pattern and practice of improper and unethical conduct, Northwestern deliberately overlooked that conduct and allowed Protess to continue teaching the Investigative Journalism classes.

227.    Northwestern deliberately ignored Protess' conduct in order to continue to obtain notoriety, prestige, and financial benefits for the University.

228.    Despite having known of this improper conduct, Northwestern used Protess, his classes, and his investigations for fundraising and marketing purposes.

229.    At the time of the Porter investigation, Northwestern had knowledge, either actual or constructive, that by funding, supporting, and encouraging Protess' use of Medill journalism classes and students to engage in improper investigative conduct and to manipulate evidence to establish the "innocence" of convicted individuals, that it was reasonably probable that such conduct would result in the incarceration of an innocent person, such as Plaintiff.

230.    As set forth throughout this Complaint, Northwestern was aware of Protess' improper, deceitful and unethical conduct in conducting alleged "investigations" as part of his Medill Investigative Journalism classes.

231.    As set forth throughout this Complaint, Northwestern knew or should have known that Protess had a particular unfitness for his position, or was otherwise behaving in a dangerous and incompetent manner, so as to create a danger of harm to third persons such as Plaintiff.

232.    Consequently, at all relevant times herein, Northwestern University had a duty to supervise Protess and his Medill Investigative Journalism class activities and to safeguard Plaintiff against this foreseeable and likely harm.

233.    Northwestern was aware of the fact that Protess and his students were investigating the Anthony Porter case and were claiming that Plaintiff was the real perpetrator of the crimes at issue.

234.    Based on Protess' prior improper conduct and history, and Northwestern's knowledge of that improper conduct and history, Protess' investigation of the Anthony Porter

case created a foreseeable risk of injury to Plaintiff, and there was a reasonable likelihood of such an injury, and Northwestern had a duty to protect Plaintiff from such an injury.

235. Based on Protess' prior improper conduct and history, and Northwestern's knowledge of that improper conduct and history, Northwestern and Plaintiff stood in such a relationship to each other that Northwestern had a duty and obligation of reasonable conduct for the benefit of Plaintiff.

236. Northwestern, by and through its duly authorized agents and/or employees, also had a duty to exercise ordinary care to guard against injuries which were probable and foreseeable consequences of its actions or failures to act.

237. Northwestern negligently failed to supervise Protess adequately or take any action to prevent Protess, with the assistance of Northwestern students and investigators, from using coercive and threatening conduct to manufacture false witness statements and obtain false confessions in order to secure the release of convicted individuals.

238. By negligently retaining Protess, as alleged herein, Northwestern breached its duties to Plaintiff.

239. Northwestern's breach of its duties to Plaintiff was the proximate cause of Plaintiff's injuries.

240. At all relevant times, Northwestern acted willfully and wantonly and with a deliberate intention to harm Plaintiff or with a conscious disregard for Plaintiff's welfare.

### Count VII
### Negligent Retention – Paul Ciolino
### (Against Northwestern University)

241. Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

242.    As described throughout this Complaint, prior to Ciolino's misconduct in relation to its investigation in the Porter case, Ciolino openly employed improper and unethical tactics, and caused Northwestern journalism students to do the same, in order to cause the release of individuals he deemed to be "wrongfully convicted."

243.    As a result of the facts sets forth herein, at the time of the Porter investigation, Northwestern's administration knew, or should have known, that as part of the Medill Investigative Journalism classes, Ciolino had utilized the tactics described above, and that he demonstrated a pattern and practice of engaging in improper and illegal conduct in order to manipulate evidence to establish the "innocence" of certain convicted individuals.

244.    At the time of the Porter investigation, Northwestern's administration either knew, or should have known, that despite being portrayed as a "journalism" class, students in Protess' investigative journalism classes did not produce any journalism but, rather, acted as criminal defense investigators advocating for defendants who had been deemed by Defendant Protess to have been "wrongfully convicted."

245.    In addition to and/or as a result of the actual knowledge of Northwestern's administration of the unethical conduct of Protess, in 1997, the then Dean of the Medill School of Journalism, Michael Janeway, expressed his concerns over the lack of oversight and supervision of Protess and his desire to cancel Protess' classes.

246.    Rather than act on Dean Janeway's valid concerns, the Northwestern administration, in conscious disregard for the consequences of Protess' conduct and misuse of his classes and students, replaced Dean Janeway with a dean that would support and/or ignore Protess' unethical and/or illegal conduct.   Northwestern made this decision based on the notoriety it was enjoying from Protess and Ciolino's "investigations."

247.    Despite their actual or constructive knowledge of Ciolino's pattern and practice of improper and unethical conduct, Northwestern deliberately overlooked that conduct and allowed Ciolino to continue working with Protess on Medill's Investigative Journalism classes.

248.    Northwestern deliberately ignored Ciolino's conduct in order to continue to obtain notoriety, prestige, and financial benefits for the University.

249.    Despite having known of this improper conduct, Northwestern used Protess, his classes, and his investigations for fundraising and marketing purposes.

250.    At the time of the Porter investigation, Northwestern had knowledge, either actual or constructive, that by funding, supporting, and encouraging Protess' and Ciolino's use of Medill journalism classes and students to engage in improper investigative conduct and to manipulate evidence to establish the "innocence" of convicted individuals, that it was reasonably probable that such conduct would result in the incarceration of an innocent person, such as Plaintiff.

251.    As set forth throughout this Complaint, Northwestern was aware of Ciolino's improper, deceitful and unethical conduct in conducting alleged "investigations" as part of Medill's Investigative Journalism classes.

252.    As set forth throughout this Complaint, Northwestern knew or should have known that Ciolino had a particular unfitness for his position, or was otherwise behaving in a dangerous and incompetent manner, so as to create a danger of harm to third persons such as Plaintiff.

253.    Consequently, at all relevant times, Northwestern University had a duty to supervise Ciolino and his work with Protess' Medill Investigative Journalism class and to safeguard Plaintiff against this foreseeable and likely harm.

254. Northwestern was aware that Protess, Ciolino, and the Medill students were investigating the Anthony Porter case and were claiming that Plaintiff was the real perpetrator of the crimes at issue.

255. Based on Ciolino's prior improper conduct and history, and Northwestern's knowledge of that improper conduct and history, Ciolino's investigation of the Anthony Porter case created a foreseeable risk of injury to Plaintiff, and there was a reasonable likelihood of such an injury, and Northwestern had a duty to protect Plaintiff from such an injury.

256. Based on Ciolino's prior improper conduct and history, and Northwestern's knowledge of that improper conduct and history, Northwestern and Plaintiff stood in such a relationship to each other that Northwestern had a duty and obligation of reasonable conduct for the benefit of Plaintiff.

257. Northwestern, by and through its duly authorized agents and/or employees, also had a duty to exercise ordinary care to guard against injuries which were probable and foreseeable consequences of its actions or failures to act.

258. Northwestern University negligently failed to supervise Ciolino adequately or take any action to prevent Ciolino, with the assistance of Protess and Northwestern students, from using coercive and threatening conduct to manufacture false witness statements and obtain false confessions in order to secure the release of convicted individuals.

259. By negligently retaining Ciolino, as set forth herein, Northwestern breached its duties to Plaintiff.

260. Northwestern's breach of its duties to Plaintiff was the proximate cause of Plaintiff's injuries.

261.    At all relevant times, Northwestern acted willfully and wantonly and with a deliberate intention to harm Plaintiff or with a conscious disregard for Plaintiff's welfare.

## COUNT VIII
### Intentional Infliction of Emotional Distress
### (Against All Defendants)

262.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

263.    Defendants accomplished an unlawful result through individual and concerted action in that they agreed, through explicit or implicit means, to falsely and maliciously cause the arrest, prosecution, conviction, and incarceration of Plaintiff for murder without lawful justification.

264.    In furtherance of said agreement, Defendants manufactured false evidence against Plaintiff, coerced Plaintiff into making a false confession to the murders, and caused Plaintiff to plead guilty to crimes he did not commit.

265.    The above described conduct was extreme and outrageous and committed with the intent to cause, or with awareness of the high probability that it would cause, Plaintiff extreme emotional distress.

266.    As a proximate result of Defendants' conduct, as described above, Plaintiff was incarcerated for over 15 years in the Illinois Department of Corrections for a crime that he did not commit and has suffered, and will in the future continue to suffer, extreme damages, including extreme emotional and physical distress and pecuniary injuries.

## COUNT IX
## Conspiracy
## (Against All Defendants)

267.     Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

268.     As described more fully in the preceding paragraphs, Defendants conspired by concerted action to accomplish an unlawful purpose by unlawful means.

269.     In furtherance of the conspiracy, Defendants committed overt acts and were otherwise willful participants in joint activity.

270.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

271.     As a proximate result of Defendants' conspiracy, Plaintiff suffered damages, including severe emotional distress and anguish, as more fully alleged above.

WHEREFORE, Plaintiff, ALSTORY SIMON, respectfully requests that this Court enter judgment in his favor and against Defendants, NORTHWESTERN UNIVERSITY, DAVID PROTESS, PAUL J. CIOLINO, and JACK P. RIMLAND, jointly and severally, for compensatory damages in a sum in excess of $40,000,000, punitive damages, costs, as well as any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, ALSTORY SIMON, hereby demands a trial by jury pursuant to Federal Rule of

Procedure 38(b) on all issues so triable.

Respectfully submitted,

ALSTORY SIMON

By _____s/  Terry A. Ekl_____
One of His Attorneys

Terry A. Ekl
EKL, WILLIAMS & PROVENZALE LLC
Two Arboretum Lakes
901 Warrenville Rd., Suite 175
Lisle, IL  60532
(630) 242-8216

James G. Sotos
THE SOTOS LAW FIRM P.C.
550 E. Devon Ave.
Itasca, IL  60143
(630) 735-3300

Andrew M. Hale
HALE LAW LLC
53 W. Jackson Blvd., Suite 330
Chicago, IL  60604
(312) 870-6926