**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ALSTORY SIMON, | ) | |
| | ) | Case No. 15-cv-1433 |
| Plaintiff, | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| NORTHWESTERN UNIVERSITY, | ) | |
| DAVID PROTESS, PAUL J. CIOLINO, | ) | |
| and JACK P. RIMLAND, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Alstory Simon alleges that Defendants' unethical journalistic and investigative practices led to his wrongful conviction and 15-year incarceration for a double murder that he did not commit. More specifically, Plaintiff alleges that Defendants knowingly falsified evidence and disseminated that evidence to the prosecuting authorities to frame Plaintiff for the murders.

Before the Court are motions to dismiss filed by each Defendant [34, 42, 43, 46] as well as Defendants' joint motion to stay discovery [48] pending resolution of those motions to dismiss. For the reasons set forth below, Defendants' motions to dismiss [34, 42, 43, 46] are granted in part and denied in part. Defendants' motion to stay [48] is denied as moot. This case is set for further status on 4/19/2016 at 9:30 a.m. to discuss scheduling and case management.

I. **Background**[1]

A. **David Protess, Paul Ciolino, and the Medill School of Journalism**

Defendant David Protess joined the faculty of Northwestern University's Medill School of Journalism in 1981. In 1990, Protess teamed up with investigative journalist Rob Warden (who specialized in wrongful conviction cases) to investigate the case of David Dowaliby, who

---

[1] The Court accepts as true the facts alleged in Plaintiff's complaint and makes all reasonable inferences in his favor. See *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 879 (7th Cir. 2012).

had been convicted of murdering his seven-year-old adopted daughter. Protess and Warden, along with several of Protess's journalism students, undertook an investigation that ultimately contributed in large part to Dowaliby's exoneration.

Protess's success on the Dowaliby case was highly publicized. In July 1990, the Chicago Tribune published a two-part series written by Protess about the investigation and Northwestern's role in Dowaliby's exoneration. Protess and Warden wrote a book about their investigation called "Gone in the Night," which inspired a two-part, made-for-TV movie that aired on CBS in 1996. Protess's accomplishments also reflected positively on Northwestern's Medill School of Journalism, and because of this rise in prestige and popularity, Northwestern encouraged Protess to continue focusing his investigative journalism class on wrongful conviction cases.

Protess's next success came in 1996, when he and his journalism students began investigating the case known as the "Ford Heights Four," which involved four men convicted for a double murder that occurred in 1978. To assist in the investigation, Northwestern hired a private investigator, Defendant Paul Ciolino. By July 1996, with the help of the Northwestern investigative team, the Ford Heights Four were exonerated. By August 1996, Protess had signed another book deal ("A Promise of Justice"), which was published in 1998.

Plaintiff alleges that Protess and Ciolino used ethically-questionable investigatory tactics in working on the Ford Heights Four case, some of which Protess wrote about in "A Promise of Justice." For example, Protess allegedly wrote a letter to a key eyewitness on Medill School of Journalism letterhead advising the witness that his monetary rights to his story were contingent on his story aligning with Northwestern's view of the case. In another instance, Ciolino allegedly posed as Hollywood producer Jerry Bruckheimer in a witness interview to add gravitas to

Protess's promise to the witness that he could reap huge financial rewards for his story. Defendants also allegedly used female students to sexually flirt with witnesses in order to manipulate their testimony, and Protess allegedly told one eyewitness "that he could have sex with either of two Northwestern Medill students if he would change his testimony." [1, ¶ 32–35.]

Plaintiff claims that Defendant Northwestern became aware of Protess's and Ciolino's unethical behavior as early as 1997, but, motivated by the "prestige, recognition and monetary benefits" that came from Protess's work, continued to endorse his program anyway. More specifically, in 1997, the Dean of the Medill School of Journalism (Michael Janeway) expressed concerns to Northwestern over the lack of oversight and supervision of Protess and Ciolino and his desire to cancel Protess's investigative journalism classes. In response, Northwestern replaced Dean Janeway with Ken Bode, "a Dean that would support and/or ignore Protess'[s] and Ciolino's unethical, deceitful and/or illegal conduct." [1, ¶ 42.] Despite the publicity surrounding these questionable investigative tactics as presented in the "massive publicity surrounding the Ford Heights Four case, and the publishing of 'A Promise of Justice,'" Dean Bode continued to support Protess's investigative journalism program. [1, ¶ 39.] And in August 1998, on the heels of the publication of Protess's second book, the Robert R. McCormick Tribune Foundation announced a $20,000,000 grant to the Medill School of Journalism.

### B. The Anthony Porter Case

Riding high on the acclaim from two successful exoneration projects (coupled with two book publications, vast media exposure, and a sizeable grant), Defendants set out to continue their streak of journalistic accomplishment. In late 1998, Protess, Ciolino, and several Medill journalism students began investigating the 1983 double-murder conviction of Anthony Porter. On the morning of August 15, 1982, Jerry Hillard and Marilyn Green were shot and killed in the

bleachers of the Washington Park swimming pool on Chicago's southeast side. Upon arriving at the scene of the crime, the Chicago police identified two witnesses, Henry Williams and William Taylor. Williams told police that, as he was exiting the Washington Park swimming pool that morning, Anthony Porter tried to rob him at gunpoint. After that exchange ended, Williams watched Porter walk into the bleachers where Hillard and Green were sitting, at which point Williams heard several gunshots. The other witness, Taylor, was in the swimming pool at the time of the murders. He did not identify the shooter initially, but later told police that he saw Anthony Porter shoot the two victims. Later that day, a Cook County State's Attorney and a Chicago Police Officer located two more witnesses, one of whom (Kenneth Edwards) said that he saw Anthony Porter shoot both victims in the bleachers.

Police apprehended Porter several days later and charged him with the murders of Hillard and Green. At Porter's trial, Williams and Taylor testified consistently with what they told the police on the day of the shootings. Porter did not testify, but his friend Kenneth Doyle falsely testified that he and Porter were somewhere else at the time of the shootings. A jury found Porter guilty of the murders, and on September 21, 1983, Porter was sentenced to death.

Shifting back to 1998, with Porter's execution date on the horizon, Defendants Protess and Ciolino and their team of journalism students began an expeditious investigation into Porter's conviction. The team first focused on Porter's mental competence to be executed "but, shortly thereafter, Defendants Protess and Ciolino formulated a plan to fabricate evidence that would exonerate Porter for the murders." [1, ¶ 80.] Defendants' primary tactic quickly materialized: they would develop an alternate suspect, and that person was Plaintiff, Alstory Simon. As Plaintiff puts it, "[al]though [Plaintiff's] name was never mentioned by a single person to police or at Porter's criminal trial, Defendant Protess found references to [Plaintiff] in

4

old affidavits submitted during Porter's original post-conviction proceedings and promptly announced, in early November 1998, before any investigation was undertaken or any evidence developed, that he was almost certain [Plaintiff] committed the murders." [1, ¶ 81.]

Plaintiff alleges that over the next seven weeks, "Defendants Protess and Ciolino, with the participation of Protess'[s] students, knowingly manufactured and fabricated four pieces of false evidence which they contended dismantled the case against Porter and proved that Simon committed the murders." [1, ¶ 84.] First, Defendants coerced eyewitness William Taylor into signing two affidavits (one prepared by Ciolino, the other by Protess) essentially recanting his prior incriminating statements against Porter. Defendants sent Taylor's statements to CBS television, pitching Taylor as the only eyewitness to the crime, and claiming that in light of this change in testimony, there was now no evidence tying Porter to the murders. But according to Plaintiff, Defendants "never made any effort to interview any of several other witnesses who had identified Porter as either the shooter or being present at the murder location." [1, ¶ 85.]

The second and third pieces of false evidence were coerced statements from Illinois inmate Walter Jackson and his aunt (and Plaintiff's estranged wife), Inez Jackson Simon. Protess contacted Walter Jackson first, promising him money and freedom to get him to sign a false affidavit claiming that Plaintiff had confessed his guilt to him 17 years earlier. Protess then had Walter Jackson call his aunt, Inez Jackson Simon, to convince her to provide a false statement of her own regarding the murders. Defendants Protess and Ciolino, along with two Medill students, visited Inez Jackson Simon in Milwaukee, where they "coaxed and induced" her into signing a witness statement by promising her money and the release of her nephew and son from prison. In the statement, Inez Jackson Simon said that she was with Plaintiff when he shot Hillard and Green in Washington Park—a statement that Plaintiff says "was blatantly inconsistent with

several key known facts." [1, ¶ 89.] Protess nonetheless sent Inez Jackson Simon's statement to CBS television, and he appeared with her on television to announce Plaintiff's guilt for the murders.

The fourth piece of falsified evidence was Plaintiff's false confession for the murders. According to Plaintiff, Defendants' "campaign to compel a false confession" from Plaintiff began in December 1998, when Protess sent two of his female students to interview Plaintiff at his home. Protess then confronted Plaintiff directly and accused him of the murders, but Plaintiff did not confess. Protess then sent in Ciolino to extract the confession. In the early morning of February 3, 1999, Ciolino—while impersonating a police officer—"bull rushed" Plaintiff's home with another investigator, guns drawn. Ciolino illegally detained Plaintiff, and "through the use of threats, fabricated evidence, false statements, promises, money, and other illegal tactics," obtained the false confession. [1, ¶ 93.] For example, Ciolino showed Plaintiff a videotape of a man (who is now known to be an actor) falsely claiming that he saw Plaintiff commit the murders. He also showed Plaintiff the television clip with Protess and Inez Jackson Simon identifying Plaintiff as the murderer. Ciolino told Plaintiff that he was facing the death penalty and that the Chicago police were on their way to arrest him, but that he could avoid the death penalty (and make large sums of money) if he confessed to the murders. Ciolino wrote out a confession stating that Plaintiff shot Hillard in self-defense and Green by accident, he had Plaintiff rehearse the statement "so that it appeared legitimate," and then he videotaped Plaintiff's statement.

Defendants' release of Plaintiff's taped confession to CBS television started what Plaintiff refers to as a "national media 'frenzy.'" Ciolino arranged for his friend, attorney (and Defendant in this lawsuit) Jack Rimland to provide legal representation to Plaintiff free of

6

charge, but according to Plaintiff, Defendant Rimland was in on the conspiracy, and he ensured that Plaintiff did not change his story by instilling fear in him that any change in testimony could lead to the death penalty. Within a matter of days, Anthony Porter was released from prison, and Plaintiff was arrested and charged with the double murder.

### C.     Plaintiff's Prosecution, Conviction, and Exoneration

In February and March 1999, the Cook County State's Attorney's Office conducted a grand jury investigation of the murders. Defendants Protess and Ciolino and several Medill students testified before the grand jury, advancing their fabricated evidence to incriminate Plaintiff. "[F]our other independent and unbiased witnesses" also testified, three of whom identified Anthony Porter at the scene of the crime (one stating affirmatively that "it was Anthony Porter who shot the victims"), and none of whom identified or implicated Plaintiff. [1, ¶¶ 103–05.] These four witnesses were prominently referenced in the police reports from the original 1982 murder investigation, but Protess's team made no effort to locate and/or interview any of them. Ultimately, "[t]he grand jury was disbanded without being asked to return an indictment against [Plaintiff]." [1, ¶ 109.] However, [i]n March of 1999, a new grand jury was empaneled and on March 24, 1999, based solely on the false evidence manufactured by the Northwestern Team, [Plaintiff] was indicted for the murders." [1, ¶ 110.] On September 7, 1999, at Defendant Rimland's insistence, Plaintiff pled guilty to the murder of Green and the voluntary manslaughter of Hillard, and was sentenced to 52 years in prison.

In 2001, Plaintiff finally spoke up, arguing in a *pro se* post-conviction petition that he had been coerced into pleading guilty, and that evidence of Porter's guilt had been hidden from him. Plaintiff's post-conviction motion was denied, but it set in motion a years-long investigation that eventually led to Plaintiff's exoneration. In late 2005/early 2006, both Walter Jackson and Inez

Jackson Simon recanted their statements, explaining that they provided false testimony based on promises made by Defendant Protess. Based on this evidence and years of legal work by Plaintiff's attorneys, in October 2013, the State's Attorney's Office announced that it would re-investigate the Hillard and Green murders. The investigation took one year, and involved interviews of over 100 witnesses. On October 30, 2014, at the suggestion of the Cook County State's Attorney's Office, the Circuit Court vacated all charges against Plaintiff and released him from custody later that day. Cook County State's Attorney Anita Alvarez issued a press release explaining, "At the end of the day and in the best interests of justice, we could reach no other conclusion but that the investigation of this case has been so deeply corroded and corrupted that we can no longer maintain the legitimacy of this conviction," adding that "this investigation by David Protess and his team involved a series of alarming tactics that were not only coercive and absolutely unacceptable by law enforcement standards, they were potentially in violation of Mr. Simon's constitutionally protected rights." [1, ¶¶ 125–26.] On February 17, 2015, Plaintiff filed this civil lawsuit against Protess, Ciolino, Rimland, and Northwestern University, seeking damages for their roles in his wrongful conviction and 15-year imprisonment.

## II.    Legal Standard

In reviewing the sufficiency of a complaint, a district court must accept all well-plead facts as true and draw all permissible inferences in favor of the plaintiff. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334 (7th Cir. 2012). The Federal Rules of Civil Procedure require only that a complaint provide the defendant with "fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Supreme Court has described this notice-pleading standard as requiring a complaint to "contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). While factual allegations must be accepted as true, legal conclusions may not be considered. *Id*.

## III.  Analysis

### A.  Time-Barred Claims

Plaintiff concedes that Counts IV through VIII of his complaint (negligent supervision and negligent retention claims against Defendant Northwestern, and intentional infliction of emotional distress claims against all Defendants) are time barred, and he has agreed to dismiss those claims. [See 55, at 17–18.] Accordingly, Counts IV through VIII are dismissed with prejudice. Plaintiff has also agreed to dismiss "all claims against Defendant Rimland" as time barred. [See 55, at 17.] Accordingly, all claims against Defendant Rimland are dismissed with prejudice. The remaining claims include a malicious prosecution claim against all Defendants (Count I), two respondeat superior claims against Defendant Northwestern (Counts II and III), and a conspiracy claim against all Defendants (Count IX).

### B.  Malicious Prosecution

To succeed on a claim of malicious prosecution under Illinois law, a plaintiff must demonstrate: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause; (4) malice; and (5) damages." *Szczesniak v. CJC Auto Parts, Inc.*, 21 N.E.3d 486, 490 (Ill. App. Ct. 2014).

The first element—the only one at issue here—requires Plaintiff to show that Defendants "commenced" or "continued" the criminal proceeding. *Id*. A criminal proceeding is formally "commenced" when a complaint, an information, or an indictment is filed. 725 ILCS 5/111–1.

Individuals (read: non-prosecutors and non-officers) can also be held liable for commencing a criminal proceeding if they "*knowingly* give[] false information to a police officer, who then swears out a complaint" based on that false information.[2] *Randall v. Lemke*, 726 N.E.2d 183, 185 (Ill. App. Ct. 2000). However, even if an individual knowingly provides false information to a prosecuting authority, he or she is not liable for commencing a criminal proceeding if the prosecution is "based upon" separate or independently developed information. *Id.*

### 1.     Knowingly Presenting False Evidence

Defendants argue that Plaintiff has failed to allege that Defendants knowingly presented false evidence to the prosecuting authorities. The Court disagrees. Plaintiff explains in detail how Defendants Protess and Ciolino—with Defendant Northwestern's knowledge and approval—fabricated four pieces of evidence, and how they presented this evidence to the Cook County State's Attorney both indirectly through public dissemination (a "media blitz") and directly through the grand jury process. [See, *e.g.*, 1, ¶ 86 ("Protess'[s] media blitz publication of Taylor's coerced affidavit, along with the misrepresentations and fabrications by omissions made by Protess, was an intentional effort to create a public sentiment, built on falsehoods of Porter's innocence, in order to influence the prosecuting authorities to free Porter."); *id.*, ¶ 97 ("Defendants Northwestern, Protess and Ciolino knowingly provided the false evidence purporting to exonerate Porter to the State's Attorney's Office."); *id.*, ¶ 103 ("In February and March, 1999, several witnesses including Defendants Protess and Ciolino, and several Medill students, testified before a grand jury about their investigation into Porter's case, and the evidence that the Northwestern Team manufactured against Simon."); *id.*, ¶ 110 ("In March of

---

[2] Alternatively, a private citizen may be held liable for "continuing" a criminal proceeding "by actively encouraging the prosecution despite knowing that no probable cause existed." *Szczesniak*, 21 N.E.3d at 491. Defendants argue that Plaintiff's own conduct (*i.e.*, voluntarily confessing to the murders) "continued" his prosecution. [See 59, at 10–11.] Because Plaintiff has adequately pled that Defendants "commenced" his prosecution, the Court need not assess this alternative basis for liability.

1999, a new grand jury was empaneled and on March 24, 1999, based solely on the false evidence manufactured by the Northwestern Team, [Plaintiff] was indicted for the murders.").]

Defendants argue that Plaintiff's confession and the other incriminating statements were given voluntarily, and so even if they ended up being false, that does not mean that Defendants *knowingly* presented false statements. Instead, Defendants claim that they knowingly presented *voluntary* statements that they learned, after the fact, were false. But this argument is belied by Plaintiff's allegations that Defendants coerced these statements using intimidation, financial incentives, sexual advances, and other unethical practices for the sole purpose of manufacturing false evidence so as to pin the murders on Plaintiff as a means of securing Porter's exoneration. [See, *e.g.*, 1, ¶ 84 ("Defendants Protess and Ciolino, with the participation of Protess'[s] students, knowingly manufactured and fabricated four pieces of false evidence which they contended dismantled the case against Porter and proved that Simon committed the murders.").] This is sufficient to allege that Defendants knowingly presented false evidence to the prosecuting authorities.

### 2.    Independent Investigation

Defendants also argue that even if Plaintiff successfully pled that they knowingly presented false evidence to the prosecuting authorities, any tainted evidence was "superseded and rendered immaterial" by the State's Attorney's independent investigation. [57, at 4 (quoting *Szczesniak v. CJC Auto Parts, Inc.*, 21 N.E.3d 486, 492 (Ill. App. Ct. 2014)).] The rule is that even if an individual knowingly provides false information to a prosecuting authority, he or she is not liable for commencing a criminal proceeding if the prosecution is *based upon* separate or independently developed information. *Randall*, 726 N.E.2d at 185. In other words, a prosecutor's independent investigation only absolves the provider of false information from liability if the

prosecutor's ultimate decision to proceed with the prosecution is "based upon" the new, non-falsified evidence.

Defendants, relying on *Randall v. Lemke*, 726 N.E.2d 183 (Ill. App. Ct. 2000), argue that "a private party may be liable for maliciously commencing a prosecution only where the private party knowingly provides false information to the public authorities, the authorities conduct *no* independent investigation, and the authorities bring charges relying *solely* upon the false information reported to them by the private party." [57, at 3 (first emphasis added).] Defendants stretch *Randall* too far. In that case, the Illinois Appellate Court affirmed the dismissal of a malicious prosecution claim, noting that even if the police would not have investigated the plaintiff absent the defendant's presentation of false evidence, this did not mean that the prosecution was "based on" the false evidence. *Randall*, 726 N.E.2d at 185–86. While this is a fair generalization of the law, it does not support Defendants' broad assertion that prosecutors must rely *solely* on false information in order to sustain a malicious prosecution claim. The standard, as the *Randall* court says, is that the prosecution must be "based upon" the false evidence. *Id.* at 186 ("If the officer relies upon the informer's report, the informer interferes with the officer's intelligent exercise of discretion, and the informer may be subject to liability.").

To close the door on Defendants' reliance on *Randall*, the operative pleading deficiency that led to dismissal in that case stemmed from the plaintiff's concession in his reply brief that "a fair reading of his complaint establishes that the charges filed against him had nothing to do with the information that defendant allegedly reported to the police." *Randall*, 726 N.E.2d at 186. This makes sense: if the falsified evidence is irrelevant to the ultimate charge, it is unreasonable to say that the charge was "based upon" the falsified evidence. But that's not the case here. Much to the contrary, Plaintiff alleges that the *only* evidence supporting the prosecution of Plaintiff is

what came from Defendants, whereas *all* of the independently discovered evidence pointed towards Anthony Porter as the guilty party. [See 1, ¶ 110 ("In March of 1999, a new grand jury was empaneled and on March 24, 1999, based solely on the false evidence manufactured by the Northwestern Team, [Plaintiff] was indicted for the murders.").] More specifically, Plaintiff lays out the evidence presented to the grand jury that led to his prosecution,[3] which includes (a) testimony from the Northwestern team, including Defendants Protess and Ciolino, advancing Defendants' falsified evidence, and (b) the testimony of "four other independent and unbiased witnesses," three of whom identified Anthony Porter at the scene of the crime (one stating affirmatively that "it was Anthony Porter who shot the victims"), and none of whom identified or implicated Plaintiff. [1, ¶¶ 103–05.] Based on these allegations, the only evidence supporting Plaintiff's prosecution is Defendants' falsified evidence, and the independently discovered evidence in no way advanced the prosecutor's case against Plaintiff. This distinguishes this case from *Randall*, and is sufficient to show, at the pleading stage, that Defendants "interfere[d] with the [prosecutor's] intelligent exercise of discretion." *Randall*, 726 N.E.2d at 186.

Defendants argue that the Cook County State's Attorney's investigation and the scope of the grand jury investigation were broader that Plaintiff alleges. But even if the Court were to take judicial notice of the grand jury proceedings, this evidence would, at most, establish a disputed issue of fact as to what the State's Attorney's decision to prosecute was "based upon"; it would not impact the Court's conclusion that Plaintiff has sufficiently pled a claim of malicious prosecution, and it certainly would not establish *as a matter of law* that the State's Attorney's prosecution was based upon independently developed evidence. While Defendants' arguments

---

[3] Plaintiff explains that there were two separate grand juries empaneled for this investigation—which Defendants refer to as the "investigating grand jury" and the "charging grand jury"—where certain witnesses testified before only one of the two panels. [See 57, at 4.] The significance of this fact, if any, is unclear. For purposes of this order, both panels are considered part of the State's Attorney's investigation.

may bear fruit at the summary judgment stage, they do little to challenge the sufficiency of the pleadings. See, *e.g.*, *Alexander v. United States*, 721 F.3d 418, 422–23 (7th Cir. 2013) (discussing the pleading standard as applied to a malicious prosecution claim).

### 3. Defendant Northwestern

In Count I, Plaintiff seeks to hold Northwestern vicariously liable for malicious prosecution based on the actions of its "employees and/or agents Protess and Ciolino." [1, ¶¶ 141–57.] The only argument that Defendant Northwestern raises in response to Plaintiff's agency/employer–employee theory of liability—as opposed to its many arguments against Plaintiff's malicious prosecution claim as it applies to its purported agents, Protess and Ciolino— is that Plaintiff "does not and cannot allege facts demonstrating that Northwestern had knowledge in 1998 and 1999 that Protess was supposedly knowingly providing false information to the authorities implicating Simon in the Hillard and Green murders." [57, at 2.] Northwestern does not tie this argument to any case law explaining the legal relevance, if any, of Northwestern's "knowledge" of the specific acts of its purported agents/employees.

But regardless, Plaintiff sufficiently alleges that Northwestern was aware of Protess's and Ciolino's ethically questionable investigative tactics since at least 1997, based on the concerns expressed by the Dean of the journalism school regarding the lack of oversight and supervision of Protess and Ciolino, as well as the massive publicity surrounding the Ford Heights Four case, including the recounting of Protess's "deceitful and unethical investigatory techniques" as discussed in his 1998 book, "A Promise of Justice." [1, ¶¶ 28–50.] According to Plaintiff, motivated by the "prestige, recognition and monetary benefits" that came from Protess's work, Northwestern continued to facilitate this ethically-questionable investigative journalism by turning a blind eye to the negative publicity and by replacing the Dean with someone who

"would support and/or ignore Protess'[s] and Ciolino's unethical, deceitful and/or illegal conduct." [1, ¶¶ 41–42.] Based on these allegations, Northwestern's argument is unavailing. Plaintiff may proceed on his malicious prosecution claim against Defendant Northwestern based on the agency-based and employer–employee theories of liability as outlined in his complaint.

### 4.    Plausibility

Plaintiff's allegations are also plausible. See *Iqbal*, 556 U.S. at 678 (a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" (quoting *Twombly*, 550 U.S. at 570)). Anthony Porter was convicted of the double murder of Jerry Hillard and Marilyn Green in 1983. Defendants Protess and Ciolino began investigating Porter's conviction in late 1998—15 years later. Just months after that investigation began, Porter was released from prison and Plaintiff was arrested and charged with the murders. Plaintiff says that in the several months that Defendants were "investigating" the case, they fabricated four pieces of evidence and then disseminated that evidence to the public in order to frame Plaintiff and exonerate Porter. It is reasonable to think that Defendants, who had garnered tremendous prestige (*e.g.*, book deals, a made-for-TV movie, sizable donations, etc.) from their involvement in two high-profile wrongful conviction cases, would be eager to continue their streak of successes. It is also reasonable to think that Defendants, who allegedly used ethically-questionable tactics in their previous investigation, would continue down that path in securing their third in a string of successful exonerations. And finally, it is plausible that the State's Attorney prosecuted Plaintiff because of the falsified evidence, which consisted of a recanted eyewitness account, a new eyewitness account, and a corroborated confession. Plaintiff's malicious prosecution claim therefore is plausible on its face, and is far from "a "[t]hreadbare recital[] of the elements of [his] cause of action, supported by mere conclusory statements." *Id.*

Because Plaintiff has alleged that Defendants knowingly provided false information to the Cook County State's Attorney that prompted Plaintiff's prosecution, and because it is not clear, as a matter of law, that the Cook County State's Attorney's prosecution of Plaintiff was based upon independently discovered evidence, dismissal of Plaintiff's malicious prosecution claim is not appropriate. Plaintiff has plausibly stated a claim of malicious prosecution against Defendants Protess and Ciolino, and thus Defendants' motion as to this claim is denied.

### C.    Respondeat Superior

Similar to its vicarious-liability allegations in Count I, Plaintiff alleges in Counts II and III that Defendant Northwestern is liable under a respondeat superior theory of liability for the torts of its employees, Protess and Ciolino. Northwestern properly notes that respondeat superior is not an independent cause of action, and must be predicated on an underlying tortious act by the accused's employee or agent, such as Plaintiff's malicious prosecution claim against the individual Defendants. Because the Court has denied Defendants' motion to dismiss Plaintiff's malicious prosecution claim against Protess and Ciolino, Northwestern's motion to dismiss Plaintiff's respondeat superior claims is also denied, and Plaintiff may proceed against Defendant Northwestern on his respondeat superior theory of liability as well.

### D.    Conspiracy

In Count IX of its complaint, Plaintiff alleges that Defendants conspired against him by fabricating evidence that they used to frame Plaintiff for the murders of Jerry Hillard and Marilyn Green, thereby securing exoneration of the real killer, Anthony Porter.

#### 1.    Statute of Limitations

Defendants' primary argument is that Plaintiff's civil conspiracy claim is time barred. Conspiracy, standing alone, is not a separate and distinct tort in Illinois. See *Weber v. Cueto*, 624

N.E.2d 442, 449 (Ill. 1993). Instead, "[a] cause of action for civil conspiracy exists only if one of the parties to the agreement commits some act in furtherance of the agreement, which is itself a tort." *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994); see also *Mauvais-Jarvis v. Wong*, 987 N.E.2d 864, 894 (Ill. App. Ct. 2013) ("Because it is the underlying tortious acts performed pursuant to the agreement that give rise to a claim for civil conspiracy, it is logical that a conspiracy claim itself be governed by the statute of limitations for the underlying tort."); 15 C.J.S. Conspiracy § 26, at 1043 (2013) (unless a jurisdiction provides an independent statute of limitations for civil conspiracy, "[t]he statute of limitations for a civil-conspiracy claim is determined by the nature of the underlying conduct on which the claim of conspiracy is based. * * * A claim alleging civil conspiracy is thus time-barred if the substantive tort underlying it was time-barred.").

Here, the tort underlying Plaintiff's civil conspiracy claim is malicious prosecution. Under Illinois law, "[a] cause of action for malicious prosecution does not accrue until the criminal proceeding on which it is based has been terminated in the plaintiff's favor." *Ferguson v. City of Chicago*, 820 N.E.2d 455, 459 (Ill. 2004). Plaintiff's conviction was vacated on October 30, 2014. Plaintiff filed this lawsuit on February 17, 2015—less than one year after his criminal proceeding was terminated in his favor. Accordingly, Plaintiff's civil conspiracy claim, which is predicated on his malicious prosecution claim, is not time barred. See, *e.g.*, *Starks v. City of Waukegan*, 946 F. Supp. 2d 780, 795–98 (N.D. Ill. 2013).

## 2. Failure to State a Claim

Defendants' also argue that Plaintiff failed to state a claim for civil conspiracy. Illinois law defines civil conspiracy as "a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful

17

means." *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999) (quoting *Buckner v. Atlantic Plant Maintenance, Inc.*, 694 N.E.2d 565, 571 (Ill. 1998)). To state a claim for conspiracy, a plaintiff must allege "(1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means; and (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused an injury to the plaintiff." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007) (citing *McClure*, 720 N.E.2d 242, 258 (Ill. 1999)); see also *Boothe v. Sherman*, 66 F. Supp. 3d 1069, 1078 (N.D. Ill. 2014) (same). "A cause of action for civil conspiracy exists only if one of the parties to the agreement commits some act in furtherance of the agreement, which is itself a tort." *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994); see also *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 939 (7th Cir. 2012). "A defendant who innocently performs an act which happens to fortuitously further the tortious purpose of another is not liable under the theory of civil conspiracy." *Borsellino*, 477 F.3d at 509 (quoting *Adcock*, 645 N.E.2d at 894).

### a.      Agreement

As to the agreement, Plaintiff alleges that in late 1998, "Defendants Protess and Ciolino formulated a plan to fabricate evidence that would exonerate Porter for the murders" by pinning the murders on Plaintiff. [1, ¶ 80.] This allegation is plausible in light of the many supporting details alleged in the complaint, including Defendants Protess's and Ciolino's prior work on exoneration cases and their desire to perpetuate their streak of successful investigations. This allegation is not vague, conclusory, or a mere recitation of an element of civil conspiracy. Plaintiff has sufficiently alleged an agreement between Defendants Protess and Ciolino.

18

### b. Tortious Act

As to the tortious act, Plaintiff only needs to allege that "the parties to the agreement commit[ted] some act in furtherance of the agreement, which is itself a tort." *Adcock*, 645 N.E.2d at 894. Plaintiff accomplished this by alleging that Defendants Protess and Ciolino maliciously prosecuted Plaintiff by "knowingly manufactur[ing] and fabricat[ing] four pieces of false evidence which they contended dismantled the case against Porter and proved that Simon committed the murders," and then by presenting that evidence to the prosecuting authorities both indirectly through public dissemination (a "media blitz") and directly through the grand jury process. [1, ¶¶ 84, 86.]. Malicious prosecution is an acceptable tort on which a conspiracy claim can be predicated, and the Court already concluded that Plaintiff's malicious prosecution claims are not subject to dismissal at this stage in the litigation. See, *e.g.*, *Boothe*, 66 F. Supp. 3d at 1078 (dismissing a conspiracy claim where the plaintiff agreed to drop her malicious prosecution claim, thereby removing the underlying intentional tort that the defendants could have conspired to perform (citing *Farwell v. Senior Servs. Assocs., Inc.*, 970 N.E.2d 49, 58 (Ill. 2012))). And Plaintiff's allegations are plausible for the same reasons that his malicious prosecution claim is plausible, as discussed in detail above. Plaintiff has sufficiently alleged that Defendants committed a tortious act in furtherance of their conspiratorial agreement.

### c. Defendant Northwestern

While Plaintiff only seeks to hold Defendant Northwestern *indirectly* liable for malicious prosecution (under its agency-based and employer–employee theories of liability in Count I, and its respondeat superior theory of liability in Counts II and III), Plaintiff seeks to hold Defendant Northwestern *directly* liable for civil conspiracy, at least according to the plain language in Count IX of its complaint. [See 1, ¶¶ 267–71.] Defendant Northwestern argues that Plaintiff

failed to allege that Northwestern entered into any agreements with Defendants Protess and/or Ciolino, and so the Court should dismiss Northwestern from Count IX. But Plaintiff says that he "*does not* allege that Northwestern conspired with its employees, Protess and Ciolino, to maliciously prosecute [Plaintiff]. To the contrary, as it is clearly pled in the Complaint, Northwestern is liable for Protess and Ciolino's conspiracy to maliciously prosecute [Plaintiff] *based on respondeat superior liability*." [55, at 24 (emphasis added).]

Regardless of what Plaintiff did or did not allege in his complaint, Plaintiff may not proceed against Defendant Northwestern directly on his claim of civil conspiracy. However, because the Court has concluded that Plaintiff may proceed against Defendants Protess and Ciolino directly on his civil conspiracy claim, Plaintiff also may seek to hold Defendant Northwestern vicariously liable for civil conspiracy under a respondeat superior theory of liability, as alleged in Counts II and III of the complaint.

### E. Defendants' Motion to Stay Discovery

Also before the Court is Defendants' motion to stay discovery [48] pending the Court's ruling on the various pending motions to dismiss. Defendants' motion [48] is denied as moot.

## IV. Conclusion

For the foregoing reasons, Defendants' motions to dismiss [34, 42, 43, 46] are granted in part and denied in part. More specifically, Defendant Jack P. Rimland is dismissed as a Defendant in this case with prejudice as the claims against him admittedly are time-barred. Counts IV through VIII of Plaintiff's complaint also are dismissed with prejudice as time barred. Plaintiff may proceed against Defendants Protess and Ciolino on Count I (malicious prosecution) and Count IX (conspiracy). Plaintiff may proceed against Defendant Northwestern on his vicarious liability theories only, as articulated in Counts I, II, and III. Defendants' motion to stay

[48] is denied as moot. This case is set for further status on 4/19/2016 at 9:30 a.m. to discuss scheduling and case management.


Date: March 29, 2016

_____
Robert M. Dow, Jr.
United States District Judge