**IN THE UNITED STATES DISTRIC COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS,**
**EASTERN DIVISION**

| | |
|---|---|
| **ALSTORY SIMON,** ) | |
| ) | |
| *Plaintiff-Counterclaim Defendant,* ) | |
| ) | |
| *v.* ) | No. 15-cv-1433 |
| ) | |
| **PAUL J. CIOLINO,** ) | Hon. Robert M. Dow, Jr. |
| ) | |
| *Defendant, Counterclaimaint, Third-* ) | |
| *Party Plaintiff* ) | |
| ) | |
| *v.* ) | |
| ) | |
| **ANITA ALVAREZ, ANDREW M. HALE,** ) | |
| **TERRY A. EKL, JAMES G. SOTOS, JAMES** ) | |
| **DELORTO, JOHN MAZZOLA, MARTIN PREIB,** ) | |
| **WILLIAM B. CRAWFORD, and WHOLE TRUTH** ) | |
| **FILMS, LLC** ) | |
| ) | |
| *Third-Party Defendants.* ) | |

**COUNTERCLAIM AND THIRD-PARTY COMPLAINT**

Paul J. Ciolino ("Ciolino") brings this counterclaim and third-party complaint against

Alstory Simon, Anita Alvarez, Andrew M. Hale, Terry A. Ekl, James G. Sotos, James Delorto,

John Mazzola, Martin Preib, William B. Crawford, Whole Truth, LLC (collectively, the

"Defendants").

**NATURE OF THE ACTION**

1.      Plaintiff Ciolino brings this counter-complaint and third-party action

alleging defamation (of the *per se* variety), false light, intentional infliction of emotional distress,

and civil conspiracy against counterclaim-defendant SIMON and the named third-party

defendants.

2.      In July, 2015, a self-proclaimed documentary entitled "Murder in the Park,"

("MIP") produced and funded by Defendant HALE and his production company WHOLE

TRUTH FILMS, LLC, premiered in Chicago at the Gene Siskel Film Center.  The documentary,

featuring Defendants SIMON, HALE, EKL, SOTOS, DELORTO, MAZZOLA, CRAWFORD,

and ALVAREZ advances an outrageous and demonstrably false claim that with the blessing of

Northwestern University, David Protess and Paul Ciolino framed an innocent man [SIMON] so

that death row inmate Anthony Porter could become a 'poster boy' for the bid to end executions

in Illinois. The documentary now airs regularly on Showtime.

3.      The self-proclaimed documentary is based largely on a book chock full of false

and defamatory statements, entitled Justice Perverted: How The Innocence Project at

Northwestern University's Medill School of Journalism Sent an Innocent Man to Prison, written

by Defendant CRAWFORD and funded by Defendant HALE.

4.      The false narrative advanced by MIP and defendant CRAWFORD's sensational

book was celebrated, promoted, and expanded upon by defendant PREIB, a former Chicago

Police officer, and author of the blog "Crooked City: The Blog About The Wrongful Conviction

Movement."

5.      Specifically as to Plaintiff Ciolino, each of the Defendants named in this

Complaint published to the public either by spoken word or in the written form false and

defamatory statements accusing Ciolino of conspiring to frame SIMON by coercing a false

confession from him.

6.      With the exception of SIMON, each and every Defendant named in this

Complaint has spent his/her career in law enforcement or representing law enforcement, or in the

case of Defendant CRAWFORD admiring and working closely with law enforcement.

7.     Defendants HALE, SOTOS, and EKL have collectively handled hundreds of federal civil rights actions brought against municipalities and law enforcement, including disgraced former Area 2 commander Jon Burge. In virtually all of these cases, the Defendants HALE, EKL, and SOTOS have represented the municipalities and defendant officers. Indeed, Defendant HALE currently represents Burge in two separate civil rights litigations pending in this Court.

8.     Each and every Defendant possessed a high degree of awareness that the statements they advanced in MIP, CRAWFORD'S book, or on Defendant PREIB's blog, were probably false and that SIMON is actually guilty of the murders to which he pled guilty and confessed to for no fewer than six separate times.

9.     As the detailed factual statement, *infra,* sets out, Defendants conspired to discredit, defame, and defeat David Protess, Paul Ciolino, and Northwestern University – all as 'pay back' for their efforts and success at revealing the injustices in the Illinois criminal justice system and their work toward abolition of the death penalty.

## JURISDICTION

10.     This Court has original jurisdiction over Plaintiff SIMON's action pursuant to 28 U.S.C. § 1332. Pursuant to Fed. R. Civ. P. 13(a), Plaintiff Ciolino's counterclaim against Defendant SIMON is a compulsory counterclaim as it arises out of the transaction or occurrence that is the subject matter of SIMON'S claims against Plaintiff Ciolino.

11.     This Court has jurisdiction over this third-party complaint pursuant to 28 U.S.C. § 1367.

## PARTIES

12.     Counterclaimant and Third-Party Plaintiff Ciolino, is a resident of the Northern District of Illinois.

13.     On information and belief, counterclaim Defendant SIMON is a resident of the State of Ohio.

14.     Anita ALVAREZ, at all relevant times, was the Cook County State's Attorney and an attorney licensed to practice law in the State of Illinois. Upon information and belief, ALVAREZ is a resident of the Northern District of Illinois.

15.     Andrew M. HALE ("HALE"), at all relevant times, was an attorney licensed to practice law in the State of Illinois. Hale is one of Defendant SIMON's attorneys in this litigation HALE was an executive producer and participant in the self-proclaimed documentary "Murder in the Park." Upon information and belief, HALE is a resident of Park Ridge, Illinois and operates his law office in Chicago, Illinois.

16.     Terry A. EKL ("EKL"), at all relevant times, was an attorney licensed to practice law in the State of Illinois. EKL is one of Defendant SIMON'S attorneys in this litigation. EKL was a participant in the self-proclaimed documentary "Murder in the Park." Upon information and belief, EKL is a resident of Wheaton, Illinois and operates his law office in Lisle, Illinois.

17.     James G. SOTOS ("SOTOS"), at all relevant times was an attorney licensed to practice law in the State of Illinois. SOTOS is one of Defendant SIMON's attorneys in this litigation. SOTOS was a participant in the self-proclaimed documentary "Murder in the Park." Upon information and belief SOTOS is a resident of Elk Grove Village, Illinois and operates his law office in Itasca, Illinois.

18.     James DELORTO ("DELORTO"), at all relevant times was a private investigator for Delorto, Mazzola & Associates located in Batavia, Illinois. DELORTO was a participant in the self-proclaimed documentary "Murder in the Park." On information and belief DELORTO is a resident of the Northern District of Illinois.

19.     John MAZZOLA ("MAZZOLA"), at all relevant times was a private investigator for Delora, Mazzola & Associates located in Batavia, Illinois. MAZZOLA was a participant in the self-proclaimed documentary "Murder in the Park." On information and belief DELORTO is a resident of the Northern District of Illinois.

20.     Martin PREIB ("PREIB"), at all relevant times, is a retired Chicago Police officer who writes for and maintains a blog entitled "Crooked City: The Blog About the Wrongful Conviction Movement." On information and belief, PREIB is a resident of the Northern District of Illinois.

21.     William B. CRAWFORD ("CRAWFORD"), at all relevant times, is an author and a public relations consultant who co-founded a media strategy and crisis management firm. On information and belief, CRAWFORD is a resident of the Northern District of Illinois.

22.     WHOLE TRUTH FILMS, LLC, is a limited liability company based in Chicago, Illinois. On information and belief, Whole Truth Films, LLC is owned and operated by defendant HALE who is the managing member.  WHOLE TRUTH FILMS, LLC produced "Murder in the Park."

## FACTUAL BACKGROUND

*The "Innocence Industry" [is] a conglomeration of defense lawyers, investigators, a major Chicago-based university (Northwestern), a misguided ex-detective, media outlets, and taxpayers who help fund some of their activities.* – Dan Curry and John Pearman, co-founders of Reverse Spin, LLC

23.     At the beginning of the final decade of the last century, nearly seventy percent of Americans favored the death penalty and wrongful convictions were seen as rare anomalies.

24.     That all changed over the course of a decade in the State of Illinois, a state that became nationally known as the hub of wrongful convictions.

25.     Against all odds, the death penalty in Illinois was abolished in 2011 largely as a result of the work of Northwestern University and certain key players associated with the institution.

26.     For many, this moment in Illinois history was a glorious triumph over a criminal justice system that had resulted in scores of travesties of justice and seemed too broken to fix. For others, it marked a dark day where evil had prevailed over good.

27.     This case is about a campaign carReid out by a small group of individuals [the third-party defendants] who largely reject the notion that the Illinois' criminal justice system has resulted in wrongful convictions (even in the face of undisputed scientific evidence).

28.     These individuals who view the hard-working advocates and the wrongly convicted as predators of a so-called "innocence industry," are now brazenly claiming that Northwestern University's Innocence Project "led by Professor David Protess framed [Alstory Simon] so death row inmate Anthony Porter could become a 'poster boy' for the bid to end executions in Illinois."

29.     To prove this absurd claim, these Defendants have conspired to defame Plaintiff Ciolino, causing irreparable harm to his reputation and destroying his career. They have acted not only with reckless disregard for the truth but also with actual malice.

**The Groundbreaking Work of David Protess, Rob Warden, and Lawrence Marshall**

30.     In November, 2003 the Illinois General Assembly passed sweeping death-

penalty reform legislation less than a year after Governor George H. Ryan exercised his clemency authority and cleared out death row. The *Chicago Tribune* trumpeted, "At last death penalty reform" calling it "historic reform of death penalty procedures in a state embarrassed by its penchant for choosing the wrong people to die."

31.     The political will to enact these reforms resulted from the exonerations of at least 13 death-row inmates, vindicated largely by the efforts of three men associated with Northwestern University, David Protess, Rob Warden, and Lawrence Marshall. Indeed, Warden and Marshall co-founded Northwestern University's Center on Wrongful Convictions, an institution that trail-blazed the anti-death penalty movement and to date has exposed scores of wrongful convictions.

32.     Protess joined the faculty of Northwestern University's Medill School of Journalism in 1981. He also served as a contributing editor and staff writer at the *Chicago Lawyer* magazine, a publication founded by award-winning investigative reporter Rob Warden.

33.     In 1991, Protess and Warden successfully exposed the wrongful conviction of David Dowaliby who had been convicted of the murder of his 7-year old adopted daughter. Warden and Protess uncovered evidence that led to Dowaliby's exoneration and which garnered significant media attention.

34.     In the mid-1990s, Protess, with the assistance of his journalism students, was instrumental in proving the innocence of Dennis Williams, Verneal Jimerson, Kenneth Adams, and William Rainge – four men who were convicted of the murder, kidnapping, and robbery of Lawrence Lionberg and Carol Schmal and the rape of Schmal. Willliams and Jimerson were sentenced to die while Adams and Rainge were sentenced to lengthy prison sentences. The four men became known as the "Ford Heights Four."

35.     While Protess (with assistance from Ciolino) led the investigation that led to their exonerations, Lawrence Marshall, a lawyer and professor at Northwestern University took up the representation of Rainge along with Matthew Kennelly (now U.S. District Court Judge Kennelly). Williams was represented by Robert Byman of Jenner & Block. Jimerson was represented by Mark Ter Molen of Mayer, Brown & Platt, and Adams was represented by Jeffrey Urdangen who also eventually became a staff attorney at the Northwestern Center on Wrongful Convictions.

36.     The Ford Heights Four were ultimately freed when DNA analysis of semen recovered from the scene not only cleared them but connected three other individuals to the horrific crime, one of whom openly confessed at a press conference. All three men connected to the crime scene were eventually convicted of the double murder and Cook County settled civil claims brought by the Four Heights Four for $36 million.

37.     Three months later, Lawrence Marshall secured the release of yet another innocent man, Gary Gauger, who had been sentenced to death in Illinois.

### Rolando Cruz and the Genesis of the Anti-Northwestern Movement

38.     In 1985, Rolando Cruz was wrongly convicted of the abduction, rape, and murder of 10-year old Jeanine Nicarico. Cruz's conviction and death sentence was reversed by the Illinois Supreme Court based on a prosecutorial misconduct by the DuPage County State's Attorney's office – led by Jim Ryan.

39.     Even after Brian Dugan, an Aurora man who was arrested (and later convicted) for a child abduction, rape and murder in LaSalle County, confessed to the murder of Jeanine Nicarico, DuPage County State's Attorney Jim Ryan insisted that Cruz and his co-defendant Alejandro Hernandez were guilty of the Nicarico rape and murder.

40.     DuPage County Prosecutor Ryan retReid Cruz despite Dugan's confession. Cruz was again reconvicted and resentenced to death row. Even after a 1992 DNA report that excluded Cruz and his co-defendant as the source of semen found on Nicarico's body, DuPage County Prosectuor Ryan steadfastly insisted Cruz was guilty.

41.     In January, 1995, Ryan was elected the Attorney General and hired as his press secretary Dan Curry, a reporter from the Daily Herald who had previously reported on the Nicarico case. Curry was also friendly with Defendants EKL and SOTOS whose law practices focused on representing accused members of the law enforcement community, and who had strong ties to the DuPage County State's Attorney's office and the DuPage County Republican establishment, including Jim Ryan.

42.     Cruz and his co-defendant eventually received a third trial much to the dismay of then-Attorney General Jim Ryan. Dan Curry told the press that Ryan and other former DuPage County prosecutors were disappointed in the ruling.

43.     Cruz was acquitted on November 3, 1995 after a high-ranking DuPage County sheriff admitted that Cruz had never made certain inculpatory statements previously attributed to him. Additional DNA testing excluded Cruz as the source of semen on the victim's body and confirmed Dugan's guilt in the case.

44.     Cruz was represented by Lawrence Marshall of Northwestern University.

45.     In the fall out from Cruz's exoneration, four sheriff's deputies and three County prosecutors were indicted by a DuPage County Grand Jury on charges of perjury and obstruction of justice. The collection of police officers and prosecutors were dubbed the "DuPage 7." Defendants EKL, SOTOS, DELORTO and MAZZOLA were outraged by this turn of events.

Defendant EKL, a former Cook County prosecutor, took up the representation of one of the accused, former prosecutor Thomas Knight.

46.     In November, 1996, Defendant EKL also successfully ran Assistant DuPage County State's Attorney Joe Birkett's election campaign for DuPage County State's Attorney.

47.     In June, 1999, Defendant EKL's client Thomas Knight and the other "DuPage County 7" were acquitted, to the dismay of many who firmly believed that the evidence showed that Cruz had been framed. For his part, Defendant EKL argued that mistakes were made but no criminal conspiracy occurred. EKL remarked, "My client [former prosecutor Thomas Knight] is a smart guy. If he wanted to frame Rolando Cruz, he would be dead right now."

48.     Despite the acquittal, the DuPage County Board represented by Defendant SOTOS reluctantly and begrudgingly agreed to pay out 3.5 million to Rolando Cruz and his co-defendant, calling the decision to pay Cruz "morally reprehensible."

49.     Defendant SOTOS later appeared before the Illinois Prisoner Review Board on behalf of DuPage County to object to Cruz's request for clemency. SOTOS spent an hour listing the reasons why Cruz was still under suspicion and telling the Board that Cruz is "conning you."

50.     That same day, Defendant SOTOS also objected (this time on behalf of McHenry County) to the clemency petition of Lawrence Marshall's client, Gary Gauger, who was also exonerated from death row. SOTOS suggested that Gauger may have contracted the killing of his parents or at least concealed evidence.

## The Center on Wrongful Convictions is Launched and Anthony Porter is Exonerated

51.     In April, 1999, Rob Warden and Lawrence Marshall officially co-founded Northwestern's Center on Wrongful Convictions ("CWC"). Marshall and Warden's work had exposed the deep and disturbing flaws of Illinois' criminal justice system and had led the

nationwide movement to reform the criminal justice system and abolish the death penalty. Indeed, in 1999, Governor George Ryan called for a moratorium on the death penalty in large part due to another Northwestern exoneration, namely the exoneration of Anthony Porter – a death row inmate who had come within hours of execution.

52.     Porter's exoneration came as a result of investigative work conducted largely by David Protess, his journalism students, and private investigator Paul Ciolino.

53.     In September, 1998, Protess was contacted by death penalty lawyer Aviva Futorian to see if he would be interested in investigating issues surrounding Porter's competence to be executed and also possible innocence.

54.     Protess initially expressed doubt that he could be of any assistance in light of Porter's impending execution, but when Porter's execution was stayed that same month, Protess and his students agreed to work on the case. Although the initial focus of Protess and his students' work centered on competency issues, it eventually turned towards issues of innocence.

55.     Porter was sentenced to death for the 1982 murders of Jerry Hillard and Marilyn Green in Washington Park on the south side of Chicago. After the shooting, police interviewed a witness, William Taylor, who had been swimming in the park pool. Taylor at first said he had not seen the person who had committed the shooting but after 17 hours of interrogation named Anthony Porter as the shooter.

56.     In November, 1999 Protess' students went to Washington Park and attempted to re-enact William Taylor's perspective on the crime based on his critical eyewitness testimony at trial. The students questioned whether Taylor could have seen what he testified to and told Protess that they wanted to interview William Taylor.

57.     Student McCann and Ciolino went to see William Taylor at his apartment. McCann, Ciolino and Taylor convened in the lobby of Taylor's building. After a short conversation, Taylor admitted that his trial testimony was false and that police had pressured him to ID Porter. Based on that statement, Ciolino promptly drafted an affidavit for Taylor to sign.

58.     After Taylor executed that affidavit, Ciolino typed a second affidavit for Taylor to sign incorporating a change that Taylor had made to the first affidavit; in every other respect the second affidavit was a mirror image of the first.

59.     Protess and Ciolino returned to Taylor's apartment on December 14, 1998, and eventually went to Ann Sather's restaurant on West Belmont where Taylor executed the type-written affidavit in which he admitted that he never saw Porter shoot the victims. Taylor later read his affidavit aloud on CBS News.

60.     After Porter's release, Taylor contacted Protess and was angst-ridden about having falsely testified against Porter, expressing concern that he might "go to hell" for having participated in the wrongful conviction of Porter.

61.     Between Christmas and New Year's of 1998, Protess and his students visited Porter who told them, among other things, that he had heard from a person named Ricky Young that Alstory Simon and his wife, Inez Jackson, were responsible for the murders. Porter did not know Simon or Jackson. The victim's mother Offie Green had also opined that Simon was involved int the murders as Simon and Inez were the last people seen with the victims. To add to the suspicion, Simon and Jackson had abruptly moved out of the neighborhood almost immediately after the shootings, and left the state soon thereafter.

62.     Based on this lead, Protess' students located Inez Jackson who was by then divorced from Simon and living apart from him in Wisconsin. Protess, his students, and Ciolino

went to Wisconsin to interview Jackson at her home. Because her home was filled with noisy children, the group offered to take Jackson to lunch at a nearby German restaurant. During that meeting, and again later on videotape, Jackson admitted that she was present when Jerry Hillard and Marilyn Green were shot and that Alstory Simon shot them in relation to a drug dispute.

*Simon Confesses On Videotape to Ciolino*

63.     The following day, Ciolino traveled to Milwaukee with his associate Arnold Reid to attempt to interview SIMON. They arrived at the house at 7:33 a.m. and SIMON answered the door shirtless. Ciolino and Reid introduced themselves and told SIMON why they wanted to speak to him. As they stood in the doorway conversing, SIMON told Ciolino and Reid, "get inside," remarking how cold it was outside.

64.     During a meeting that would last no longer than 30 minutes, Ciolino told SIMON that they had developed evidence that pointed to him as the offender and that another man had been sentenced to a die for a crime that he did not commit. In an effort to gauge SIMON's response, Ciolino showed SIMON a clip of a video that Ciolino had prepared in which a young man claimed to see SIMON commit the shooting. The young man was not an actor, but rather a kid who worked for Ciolino. SIMON laughed off the video, remarking in sum and substance, "Fuck you man, that guy wasn't there." Ciolino remarked in sum and substance, "But you were."

65.     Moments later, Ciolino noticed that SIMON's television was on and happened to be re-airing a news report from the night before in which the Porter case was covered and was broadcasting Inez Jackson's video-recorded statement pointing the finger at SIMON as the responsible party.

66.     SIMON watched the report intently and was overcome with emotion. He then admitted that he committed the shooting but claimed he had acted in self-defense. SIMON agreed to go on video to tell his story and delivered the statement unrehearsed.

67.     After completing his video-recorded statement, SIMON asked Ciolino whether he was going to need a lawyer and Ciolino told him that he most likely would. At Simon's request, Ciolino offered the names of two well-regarded lawyers who Ciolino knew, Jack Rimland and Gerald Boyle.  Ciolino and Reid departed the premises at 8:03 a.m.

68.     Ciolino made a copy of the video-taped confession and then arranged for the original to be delivered to the Cook County State's Attorney's office that same day.

*Simon Confesses Five More Times*

69.     On February 11, 1999, Jack Rimland and Steve Wagner (another attorney and now a sitting judge) visited SIMON in jail. SIMON again confessed to bother lawyers, adding additional details about the crime, including giving details about the motive for the crime and his history with Hillard and Green.

70.     On September 7, 1999, Simon admitted his guilt again, this time in open court. During the lengthy plea proceeding, Simon denied being forced or promised any benefit in exchange for his guilty plea. After Marilyn Green's mother, Offie Lee Green, directly *asked* SIMON why he took her daughter's life, '"What did my daughter do to you?" she pleaded. SIMON *impromptu* responded:

> Your daughter never did nothing to me. I never meant to hurt your daughter And
> – excuse me. (Short pause) It was an accident that your daughter got shot. I never
> meant to hurt her. Never meant to do it. Never meant her no harm at all. I had
> things between Jerry and I. And when the shots started she just, she was coming
> past and happened to got in the way when the shot went off. Before I realized it I
> had already squeezed the trigger, she was trying to stop me from coming at Jerry.
> She threw up her hands, and trying to hit her in the hand, I didn't even realize she
> had, she even hurt that bad."

71.     In exchange for his guilty plea, SIMON received a sentence of 37 years' imprisonment (with day for day good time) and prosecutorial immunity in the murder of Felix Alonzo for which SIMON was a suspect. All in all, SIMON would serve roughly 17 years in prison for a double homicide that had earned Anthony Porter a sentence of death. SIMON never attempted to withdraw his guilty plea.

72.     On or around October 25, 1999, Simon wrote a letter to his attorney, Jack Rimland, thanking him profusely for his representation. Simon also enclosed a copy of letter that he had attempted to send directly to Anthony Porter, asking Simon to forward the letter to Porter. SIMON stated in pertinent part, "I hope it [the letter] finds you in an open frame of mind. What I'm about to express is deep from the reservoir of my heart. I never knew that someone had been blamed for the double-slaying. As I sat in the privacy of my home watching time you appeared on the network, and the clock was ticking. I knew then that it was true. It was nothing of conscious, nor pity or trickery by the investigators. When I saw you I could not let that happen to you." Simon offered his heartfelt apology to Porter, even inviting him to come visit him in the penitentiary.

73.     On November 24, 1999, SIMON confessed again. This time, he participated in a television interview with Milwaukee television station reporter Colleen Henry from WISN, an ABC affiliate station, from the Illinois Department of Corrections. Indeed, even prior to the interview, Simon wrote Jack Rimland a letter, informing him that he was canceling an interview with another network because he wanted to give the interview to his "friend" Ms. Henry, and that Ms. Henry wanted to interview Simon and Porter together.

74.     In that interview, Simon again confessed, explaining how he never meant for the shooting to happen but "before I knew anything, I just pulled it up and started shooting." Simon

15

said "I thought I got away with it . . . long as it never was brought up, I wasn't going to say anything." On the issue of Porter sitting on death row for a crime he had committed, Simon told the reporter "he had sat there all these years for something he didn't do . . . and now they fitting to kill him too? That's when I decided that I was not going to let this man die for something that he did not do . . and that's when I told the investigator . . . ok man let's do this."

75.     Even in May, 2000 – seven months after entering his guilty plea, SIMON wrote a letter to attorney, David Thomas, who had acted as co-counsel to Jack Rimland and had appeared in court previously on SIMON's behalf . Although in the letter SIMON inquired whether Thomas would be willing to represent him on post-conviction proceedings and complained about Rimland's performance, SIMON never claimed that his confessions or guilty plea were involuntary or that he was actually innocent of the crime. SIMON wrote, "David, I'll be fifty years old this second day of June. I never meant to kill anyone. I was only defending myself from a young man who was trying to kill me and another person was killed by accident."

76.     With some time to reflect, SIMON decided he did not want to serve his 37-year sentence after all. eventually reverted to his old ways, trying to figure out how to avoid actually serving the sentence he justly earned. Luckily for him, he found allies in two private investigators, Defendants DELORTO and MAZZOLA. DELORTO and MAZZOLA cared nothing of SIMON's plight but had an agenda that worked to SIMON's benefit.

### A Conspiracy to Disrupt the "Innocence Industry" and Discredit David Protess

77.     On February 3, 1999 at 6:00 p.m., Simon's videotaped confession aired on WBBM-Channel Two. Defendants DELORTO and MAZZOLA watched the SIMON confession on television and remarked by their own admission: "What a crock of shit!"

78.     Defendants DELORTO and MAZZOLA are both retired ATF agents who run a private investigative firm that works almost exclusively for Defendants EKL and SOTOS. Defendants DELORTO and MAZZOLA were no fans of David Protess, Paul Ciolino, or Northwestern as a whole. They both questioned the exoneration of the Four Heights Four and believed that the Ford Height Four should still be imprisoned, despite the fact that DNA evidence cleared them and implicated three others.

79.     Defendants EKL and SOTOS along with their investigators Defendant DELORTO and SOTOS were disgusted by the Porter exoneration and agreed that Northwestern and David Protess needed to be stopped. This agenda became of particular importance when Protess took up the politically charged case, involving death row exoneree Gordon "Randy" Steidl. The threat posed Protess became more urgent. At that point, Defendants DELORTO, MAZZOLA, EKL, and SOTOS conspired to ruin the reputations of Northwestern University, David Protess, and Paul Ciolino by attacking the integrity of their success stories. Defendants EKL and SOTOS instructed DELORTO and MAZZOLA to discredit the case for innocence against Anthony Porter.

80.     In mid-2000, Defendants DELORTO and MAZZOLA who were on the SOTOS/EKL payroll, visited defendant SIMON in the Illinois Department corrections and falsely persuaded him that Paul Ciolino had violated his rights in the course of securing his confession to the double-homicide for which Anthony Porter was convicted and sentenced to death.

81.     Defendants DELORTO and MAZZOLA sent SIMON court filings, testimony, and documents and arranged to have him file a *"pro se"* post-conviction petition attempting to

vacate his guilty plea, alleging that his confession(s) and in-court guilty plea were the product of illegal and unethical conduct by Protess, Ciolino, and Jack Rimland.

82.     Compensated by Defendants EKL and/or SOTOS, Defendants DELORTO and MAZZOLA began a quest to dismantle any and all evidence that pointed to Porter's innocence. Although they had been involved in advancing his case since 2000, Defendants EKL and SOTOs formally undertook the representation of SIMON when they filed a successive post-conviction petition on his behalf in 2005.

83.     Defendants DELORTO, MAZZOLA, EKL, and SOTOS knew that SIMON was guilty and that any claims that his confession was coerced were bogus. But together, the Defendants contrived an elaborate tale to explain away SIMON's many confessions (no fewer than six) to the murders. Defendants DELORTO and MAZZOLA even paid SIMON money in exchange for his cooperation with their efforts to defame Protess, Ciolino, Rimland, and Northwestern University. In a letter written to Defendant SOTOS prior to his release, SIMON referenced payments he received from DELORTO and MAZZOLA and asked for additional financial assistance from SOTOS. Defendant SIMON wrote to Defendant SOTOS:

> You mention that if I needed anything to let you know. I don't try to be a burden on anyone. But I could use some finances man. I have been confined for 12 years and 7 months I don't here from any of my people. I have no money coming in. Jim [DELORTO] and John [MAZZOLA] sends me a little something every now and then. . . [If] you do decide to send anything, we can receive money orders up to $200 you can send as many as you want, but they can't exceed that limit . . . Five $200 money orders is enough finances to last me a year for an intire [sic] year in here.  Letter from SIMON to SOTOS dated 9-16-2011

84.     Significantly, around the time that Defendants EKL and SOTOS took up SIMON's cause, David Protess and his students also began investigating the wrongful conviction of Gordon "Randy" Steidl, who was serving a death sentence for the murder of a young married couple in Paris, Illinois. In addition to thoroughly discrediting the evidence that had been used to

convict Steidl and his co-defendant Whitlock, Protess had publicly theorized that an alternative suspect, a prominent Paris, Illinois businessman and banker by the name of Robert ("Bob") Morgan, was a strong suspect in the murders.

85.     In May, 2000, CBS 48-Hours aired a show about the Paris, Illinois murders challenging the shaky evidence on which Steidl's conviction rested and suggesting that other suspects had not been fully vetted by the police. David Protess pointed the finger at Bob Morgan as one of those suspects.

86.     Steidl was released from prison in 2004, owing in part to Protess' investigative efforts. By this point, the media was paying close attention to the case and asking questions about Morgan's connection to the Paris, Illinois double homicide.

87.     Morgan, a powerful and wealthy businessman with ties to the Republican establishment who had donated generously to Jim Ryan's various election bids conveniently hired Ryan's former press secretary and spokesman, Dan Curry, in late 2005 to counteract the narrative that Morgan might be responsible for the murders. Curry was paid $8000 a month as consultant. Dan Curry later partnered up with his long-time friend John Pearman, a native of Paris, Illinois who had also worked as top staff for Jim Ryan, to form a PR firm they named Reverse Spin, LLC.

88.     Meanwhile, Steidl filed a federal civil rights lawsuit naming the City of Paris, Edgar County, and various law enforcement personnel including Mike McFatridge, alleging that he had been framed for the Paris murders. The City of Paris hired Defendant SOTOS to represent it, and the prosecutor's office hired Defendant EKL to represent them.

89.     With a fierce and common goal to discredit Northwestern, Morgan's mouthpiece Dan Curry, along with Defendants EKL, SOTOS, DELORTO, and MAZZOLA joined forces to

bring down David Protess. Part of the strategy to discredit Protess was to undermine his work on the Porter case. In an April 2006 memo written to Defendants EKL and SOTOS, Curry accused Protess of a pattern of demagoguery and wrote that he "will continue to work closely with Sotos and Ekl to push the Anthony Porter/Alstory Simon case into the media."

90.    In early 2007, Curry proposed to Morgan (and Defendants EKL and SOTOS) the idea of producing a book or documentary that would essentially "swiftboat" David Protess and his work on the Porter case. In a memo to Morgan, copied to EKL and SOTOS, Curry recommended engaging Rick Reed of the SRCP who was responsible for the so-called John Kerry "swift boat" ads (that were widely seen as an unfair attack on John Kerry's military service during the 2004 presidential race) to produce a movie that would show "the role David Protess and others played in framing Alstory Simon." The movie would also address Protess' role in the Steidl case and his alleged smears of Bob Morgan. Curry also suggested writing a book about Protess' "dishonesty" and "framing of Morgan and Alstory Simon."

91.    Although Reed was never hired to produce a documentary and Curry never wrote a book, the idea of writing a book and producing a documentary to help further the goal of discreding Protess, Ciolino, Rimland, and Northwestern stuck. Ultimately, Defendants engaged former Chicago Tribune writer, Defendant CRAWFORD, to write a counter-narrative to the Anthony Porter exoneration for the purpose of discrediting David Protess, his colleagues, and the "innocence movement" at large.

92.    In a piece entitled, "A Toast of Sorts to the Real Warriors . . ." authored by Defendant PREIB and posted on his blog, "Crooked City" - a blog devoted to hyperbolic rants blasting anyone associated with the criminal defense bar, Defendant PREIB wistfully recounts a gathering of seven men, presumably the "Real Warriors," at a restaurant on Chicago's westside.

The "Real Warriors" in attendance included two retired Chicago police detectives who had been accused of torturing suspects, Defendants DELORTO, MAZZOLA, CRAWFORD, and PREIB. The purpose of the meeting? "To discuss strategies by which they might combat the wrongful conviction movement in Chicago."

### Anita Alvarez Does a 'Solid' for her Friends, Releasing a Murderer to Settle a Score

93.     After all of Defendant EKL and SOTOS' efforts to vacate SIMON's guilty plea failed in the courts, Defendants EKL and SOTOS reached out to their friend, Defendant ANITA ALVAREZ for assistance. With virtually no independent investigation to speak of, Defendant ALVAREZ eagerly accepted Defendants EKL and SOTOS' wild accusations against David Protess, Paul Ciolino, and Jack Rimland. Defendant ALVAREZ purposefully ignored the mountain of evidence against SIMON. Defendants EKL, SOTOS, and ALVAREZ conspired to "exonerate" a man they knew was guilty to settle a score with David Protess and Northwestern University.

94.     ALVAREZ had no love loss for Northwestern and Protess specifically. Contemporaneous with EKL's request, ALVAREZ's office was engaged in active litigation with Protess regarding his attempts to demonstrate the innocence of an inmate named Anthony McKinney. ALVAREZ successfully moved a circuit court judge to find that Protess had waived his reporter privilege. In an unprecedented ruling, the court permitted ALVAREZ's office to embark on an odyssey to discover everything and anything she could about Protess' investigations. Indeed, Northwestern and Protess was ordered to turn over every email, memo, record, and document that Protess and his students had written. Forensic discovery was ordered on every computer Protess and his students had every touched

95.     Defendant ALVAREZ was also moved to assist her friend Defendant EKL in his bid to see SIMON released after EKL promised to help in her re-election bid that was just around the corner. In an email circulated by Defendant EKL earlier this year, Defendant EKL solicited donations for Defendant ALVAREZ and the "Friends of Anita Alvarez" fundraising efforts. Defendant EKL invited the recipients of the email to send checks to his office that he would forward to Alvarez's campaign.

96.     Before announcing that the Cook County State's Attorney would be dropping all charges against Defendant SIMON, Defendant ALVAREZ made false and defamatory statements, *infra*, about Paul Ciolino to the public, claiming that Ciolino had coerced the original confession from SIMON. Defendant ALVAREZ'S statements during the press conference were featured in the documentary "MIP." (See Count I of Complaint)

97.     Meanwhile, Defendants HALE and his production company Defendant WHOLE TRUTH FILMS, LLC funded and produced a film that purports to be a documentary about how David Protess and his students with the help of Paul Ciolino and Jack Rimland conspired to frame an innocent man (Alstory Simon) to secure the release of a man they knew was guilty (Anthony Porter).  The purported documentary entitled "Murder in the Park" ("MIP") premiered in a Chicago film festival in July, 2015 and now regularly airs on Showtime.

98.     The so-called documentary consists largely of interviews with Defendants SIMON, HALE, EKL, SOTOS, DELORTO, MAZZOLA, and CRAWFORD during which they repeatedly make false and defamatory statements about Ciolino (and Protess and Rimland) identified in specificity *infra*. Although the film purports to be a documentary, participants were compensated financially for participating in the project.

99.     In and around the time the documentary was released, Defendant CRAWFORD published a book, on which the documentary is allegedly based, entitled <u>Justice Perverted: How the Innocence Project of Northwestern University's Medill School of Journalism Sent An Innocent Man to Prison.</u>

100.     Crawford's book was bankrolled by Defendant HALE. The book is self-published by independent book publisher Amika Press, but the copyright page of CRAWFORD's book lists 53 W. Jackson Blvd. as the address for Amika Press. Notably, Defendant HALE's office address is 53 W. Jackson Blvd.

101.     Defendnat CRAWFORD's book is full of false and defamatory statements about Ciolino (and others) identified more specifically, *infra*. (Count II of the Complaint)

102.     Also, instrumental in the plot to discredit the "innocence industry" is the aforementioned Defendant PREIB. In addition to promoting the false narrative set out in both defendant CRAWFORD'S book and defendant HALE'S documentary, Defendant PREIB makes false and defamatory statements about Ciolino (and others) on a regular basis. This Complaint will address only those directed at Plaintiff Ciolino.

## COUNT I – DEFAMATION
**(Against Defendants Simon, Hale, Ekl, Sotos, Delorto, Alvarez, Crawford, and Preib)**

Plaintiff hereby incorporates, in their entirety, each and every paragraph contained in this complaint and by reference makes said paragraphs a part hereof as if fully set forth herein.

103.     On or around July 15, 2015, the documentary MIP which was funded and produced by defendant HALE and his production company defendant WHOLE TRUTH FILMS, LLC premiered at the Gene Siskel Film Center in Chicago, Illinois.

104.     After defendants HALE and WHOLE TRUTH FILMS, LCC sold MIP to Sundance Select/IFC Films, the movie aired on Showtime on February 17, 2016 and continues to air to this day.

105.     Defendants SIMON, EKL, SOTOS, HALE, DELORTO, CRAWFORD, and ALVAREZ all make false and defamatory statements in this documentary, including false and defamatory statements against Mr. Ciolino.

106.     The following chart identifies the false and defamatory statements made against Mr. Ciolino in the documentary MIP, including a time stamp of when the statement is made in the film.

**MURDER IN THE PARK**

| Statement | By Who | Timestamp |
|---|---|---|
| This case had a motive behind it bigger than the crime. They did it. They killed the death penalty on the wrong case. | Jim Delorto | 8:02 |
| So there you have an honest answer. It wasn't about finding the truth, it was about freeing Anthony Porter. | Andrew Hale | 31:19 |
| *They stay on people* to try to finally get something out of them that fits their theory of who they think did the case. | Terry Ekl | 32:52 |
| They call it a recant and *what they get him to say is*, "I was in the park. I never saw Porter with the gun. I didn't see Porter fire the shot." And this is the journalism professor of one of the top if not the top journalism schools in the country does an affidavit that intentionally leaves out the most important fact of all. | Andrew Hale | 35:31 |
| That is something that William Taylor told Northwestern before they obtained his affidavit and they just left it out of the affidavit. | James Sotos | 36:00 |
| And they seized on the name of a guy whose name had surfaced at some point but with no evidence and concluded that they were almost certain he was the real killer. | James Sotos | 38:00 |
| She had been promised all kinds of favors from Protess including money in exchange for her testimony | Bill Crawford | 46:44 |
| So that seems to me to be part of their M.O. They'd go to impoverished people who don't have a lot of money, make them | Terry Ekl | 49:44 |

| | | |
|---|---|---|
| promises and basically get them to recant. | | |
| Alstory Simon was approached at 6:30 in the morning after he had spent the night doing cocaine. So he was clearly intoxicated. | James Sotos | 51:25 |
| When I opened the door, there was Paul Ciolino and Arnold Reed. They were armed with weapons and had a video camera and a tripod and badges. They claimed to be police investigators from Chicago investigating a 1982 homicide and bogarded their way on into the house. | Alstory Simon | 51:34 |
| And they just pushed me back up in the house like Police do when they come in to make an arrest. They pushed me and shoved me into a corner part of what a sofa was. He stood over me, and Arnold Reed, he started going from room to room. I'm asking him what are you walking all through my house for? What are you looking for?<br><br>So Ciolino he tells me, "we know you did these murders. You're going down for these murders and there's nothing you're going to be able to do about it."<br><br>I'm telling him man I don't know nothing about no murders man what are you talking about? I said, "man just get out of my house man."<br><br>He said, "no we're not going anywhere you better look at the evidence and I'm gonna show you this is why we think you did it." So he showed me affidavits of some people." | Alstory Simon | 52:06 |
| He [Ciolino] showed Alstory Simon the statement that Walter Jackson had made claiming that Alstory Simon had admitted the crime to him 17 years earlier. Alstory Simon said that's ridiculous. Get out of my house. Ciolino then pulled out a video camera. | Andrew Hale | 52:56 |
| Alstory Simon did not know that this African American making these allegations on this videotape was an actor, hired by Ciolino and scripted by Ciolino. | Bill Crawford | 53:28 |
| I became fearful of my life though. Then after he says, "look Alstory we got all the evidence we need to put you on death row but I'm going to level with you, we're not police officers." I said, "what?" He said, "no we're not police officers, were investigators working for the same person that you just seen on the screen, Professor Protess." So I said, "well get the hell out of my house." They refused to leave and he said, "look all we want to do is stop this execution." | Alstory Simon | 54:37 |

| | | |
|---|---|---|
| And then to create the urgency they told him that you only have a half hour to help yourself. If you don't' say that you did this crime in self-defense in the next half hour, the Chicago police are going to walk in here, arrest you, take you downtown and there's nothing anybody can do to help you. This is your only opportunity. | James Sotos | 55:18 |
| Then he tells me if I cooperate with him, he'll make sure that it was a self-defense murder and when he said that he made me feel like he was trying to give me a way out and he told me that um I would be paid financially well off, that I'd never have to work again if I cooperated with them and I'd ask them, "man are you fucking serious?<br><br>And he said, "Look you can play hardball all you want but I'm telling you you're going to death row and there's nothing you can do about it."<br><br>I tell him, "I didn't murder anybody." He puts his hand on his gun ya know and started easing it up like this that tells me hey we can do this the easy way or we can do this the hard way.<br><br>Being souped up on drugs and alcohol I was paranoid and I'm thinking when he said the easy way or the hard way that he's going to shoot me in my head and make it look like that he's come to question a murder suspect and I maybe open fired on him and he had to kill me and all this kind of stuff is going through my head. So again I tell them to get out of my house. So I tReid to get up to get to the phone to call the Milwaukee authorities. Arnold Reed blocked me from using the phone and he put his hand on the phone and pulled his gun out literally so I sat back down.<br><br>Then Ciolino he tells me, if you cooperate with us, I guarantee you that you will come out of this with millions of dollars, that the money will come from movies and book deals and all of this kind of stuff, that professor Protess will pull the necessary strings to get you released in a couple of years. You only have to do a few years and all we want is to stop this execution.<br><br>Now I'm scared to death after what I done saw on this TV screen I wanted the man out of my house so bad and I asked him and said well what do you want me to do?<br>So he picked up the papers that he showed me and he started writing stuff on a piece of paper and underlining different stuff and then told me I want you to say this on camera.. | Alstory Simon | 55:37 |

| | | |
|---|---|---|
| Ciolino basically used Walter Jacksons affidavit as a template for Alstory Simons confession | Andrew Hale | 58:12 |
| So we rehearsed it oh man for a long time because that's how out of it I was and then when he felt that I had it down pat to sound convincing enough, we put it on camera. | Alstory simon | 58:18 |
| And while I was talking I had the paper ya know right next to me on the cocktail table so if I forgot something, I could look at it ya know and say what he wanted me to say. | Alstory Simon | 59:50 |
| And then he told me that the only person who would see that tape would be the prosecution. | Alstory Simon | 1:00:17 |
| And at one point in a Chicago magazine article, he acknowledges that he "bull-rushed" this client into confessing. | Bill Crawford | 1:02 |
| Ciolino acknowledges that he used an actor. He acknowledges that he scripted the actor but he denies flatly that he ever promised favors or that he ever threatened him. | Bill Crawford | 1:02:20 |
| I strongly believed and felt that I wouldn't have had a chance to sit on death row no five years, not even no five months. I believe they would have killed me immediately. | Alstory Simon | 1:04:56 |
| And the key is he [Ciolino] told him, I'll get you a lawyer. We'll take care of that because the only way this was going to work is if they made sure that Simon had a lawyer who wasn't really going to represent him. | James Sotos | 1:05:08 |
| He [Ciolino] also told me that they was going to furnish me with the best defense attorney in the city of Chicago. He went to my phone, made a call and told me that attorney Jack Rimland would be representing me and then they packed up and left. | Alstory Simon | 1:05:23 |
| Ciolino got the confession and then handed him over to his office mate and his own personal attorney to represent him and tell him that he had to plead guilty. | Terry Ekl | 1:06:15 |

27

| | | |
|---|---|---|
| That lawyers' job was to scrutinize the confession that Ciolino had taken from Alstory Simon. Now how is a lawyer who is close friends with the person who took the confession going to scrutinize that confession? The first thing he did was to announce publicly that he understood that if Alstory Simon was charged he'd be facing the death penalty which is almost exactly what Paul Ciolino told Alstory Simon to get him to confess in the first place. | James Sotos | 1:06:25 |
| David Protess engineered the investigation and Paul Ciolino executed the investigation | Andrew Hale | 1:21:36 |
| Justice compels that I take action today. This case has undoubtedly been the most complicated and the most challenging re-investigation that we have undertaken. One of the most significant factors that led me to today's decision was the fact that the original re-investigation into this case was conducted by a former journalism professor, a private investigator employed by that professor and a team of young journalism students. | Anita Alvarez | 1:25:34 |
| This investigation by David Protess and his team involved a series of alarming tactics that were not only coercive and absolutely unacceptable by law enforcement standards, they were potentially in violation of Mr. Simons constitutionally protected rights. | Anita Alvarez | 1:26:12 |
| My view, the original confession, made by Alstory Simon and the coercive tactics that were employed by investigator Ciolino have tainted this case from the outset and brought into doubt the credibility of many important factors. At the end of the day and in the best interests of justice, we can reach no other conclusion but that the investigation of this case has been so deeply corroded and corrupted that we can no longer maintain the legitimacy of his conviction. | Anita Alvarez | 1:26:48 |
| The bottom line is that the investigation conducted by Protess and private investigator Ciolino, as well as the subsequent legal representation of Mr. Simon were so flawed that it is clear that the constitutional rights of Mr. Simon were not scrupulously protected as our law requires. This conviction therefore cannot stand. | Anita Alvarez | 1:27:26 |

107.    As a proximate result of the foregoing defamatory statements by Defendants

SIMON, DELORTO, EKL, SOTOS, HALE, CRAWFORD, and ALVAREZ, Plaintiff suffered

injuries, including injuries to his reputation.

28

108.    Indeed, the defamatory statements are *per se* defamatory as they impute the commission of a criminal offense and impute an inability to perform or want of integrity in the discharges of duties related to Mr. Ciolino's employment.

109.    The foregoing defamatory statements were made by the Defendants with the knowledge of their falsity and with actual malice, so as to justify an award of punitive damages. Defendants EKL, SOTOS, DELORTO, MAZZOLA, HALE, CRAWFORD and ALVAREZ knew that Defendant SIMON'S claims that Ciolino coerced his confession were false where Defendants DELORTO and MAZZOLA fed the false narrative to SIMON and the Defendants discussed this plan to discredit Protess and Ciolino.

110.    The Defendants ether knew that SIMON's claims were false or possessed a high degree of awareness that they were probably false when SIMON had never once mentioned that he was completely and factually innocent of the offense or that his confession to Ciolino was false until *after* SIMON was contacted by defendants DELORTO and MAZZOLA.

111.    The Defendants knew SIMON's claims were false or possessed a high degress of awareness that they were probably false when SIMON confessed no fewer than five times *after* he confessed to Ciolino, including offering an impromptu and heartfelt apology in open court during his guilty plea proceedings that revealed his intimate knowledge about the shooting, again in letters to his prior attorney Jack Rimland, again in an apology letter to Anthony Porter, again in a lengthy prison interview that featured both him and Porter conducted months after his guilty plea, and even in a letter to his former co-counsel David Thomas in May of 2000 in which SIMON complained about the representation he received from Rimland but *again* fully admitted that he was the person who shot the deadly bullets.

112.     Defendants can present *no* plausible explanation for SIMON's repeated confessions well after Ciolino's alleged "coercive" tactics were no longer in play. Indeed, Defendants can point to no other instance in the history of the criminal justice system where a defendant offered six false confessions, spread out over many months long after the alleged coercion dissipated. In light of these undisputed facts, even if Defendants did not supply SIMON with this false narrative (which they did), they certainly knew it was false or possessed a high degree of awareness of its probable falsity

113.     Likewise, Defendant ALVAREZ knew that the narrative advanced by SIMON and his attorneys EKL and SOTOS was false in light of SIMON's many confessions and impromptu speeches detailing his intimate knowledge of the facts of the crime. At a minimum, ALVAREZ harbored serious doubts about the truthfulness of SIMON, EKL and SOTOS' allegations and possessed a high degree of awareness that SIMON's story was probably false.

114.     When Defendant ALVAREZ dismissed all charges against SIMON, she was fully aware of the strength of evidence against SIMON and the fact that he had repeatedly confessed to the crime well after his single encounter with Paul Ciolino.

115.     Defendant ALVAREZ conducted no meaningful investigation of SIMON's claims instead eagerly agreeing to release a man she knew was guilty, all in the name of "pay backs" and promises of future campaign donations.

## COUNT II – DEFAMATION
### (Against Defendant Crawford)

Plaintiff hereby incorporates, in their entirety, each and every paragraph contained in this complaint and by reference makes said paragraphs a part hereof as if fully set forth herein.

116.    On June 9, 2015, and continuing until the present day, Defendant CRAWFORD published to the public a book entitled <u>Justice Perverted: How the Innocence Project of Northwestern University's Medill School of Journalism Sent An Innocent Man to Prison.</u>

117.    The book is widely available on the internet and elsewhere. Additionally, Mr. Crawford is currently promoting the book by routinely making appearances at public locations, including the Evanston Public Library and Chicago Public Library (on April 21, 2016), and reading excerpts from the book.

118.    The book contains numerous false and defamatory statements, including false and defamatory statements against Mr. Ciolino.

119.    The following is a list of false and defamatory statements made in defendant CRAWFORD'S book as to Plaintiff Ciolino:

(a)    "On December 14, Ciolino and this time Protess returned to Taylor's Clarendon residence, picked him up, and drove him to Ann Sather's, a popular eatery not far from where Taylor  lived. *There, after plying Taylor with wine*, they asked him – and he complied – to sign a second affidavit, witnessed by Protess and notarized by Ciolino." At Pg. 44.

(b)    "Barely conscious, Simon was awakened from his stupor about 6:30 a.m. by two men armed with guns who identified themselves as "police investigators" from Illinois." Pg. 61

(c)    "Ciolino told Simon that all Protess wanted was to free Porter, that when Porter got out, millions of dollars would be flying around from book deals, Hollywood movies, and the like. And Simon would be sharing in the bounty. Simon had to move quickly, however, because Chicago police were on their way to Milwaukee at that very  moment to arrest Simon and return him to Chicago in chains to face the double-murder charge." Pg. 63

(d)    "If Simon agreed and confess, Ciolino promised Simon that a Chicago lawyer, a veteran member of the defense bar by the name of Jack Rimland, would take Simon's case. And Rimland would take it free of charge. All the defendant had to do was plead guilty, but – and it was a major-league "but" – he had to extend a personal apology to Green's mother and to Porter. That was the key: Simon had to extend the apology for the deal to go through." Pg. 63

(e)    "Ciolino said that Protess, a respected professor wielded immense clout back in Chicago, would see to it that if Simon pleaded guilty and extended the apologies, the resulting prison sentence would be short, no more than a two-year stretch. It was an iron-clad guarantee, and here is why it all made sense to Simon – when Simon finished doing his time, just twenty-

four months, Ciolino assured him, there would be millions of dollars waiting for him on the outside. Again, book deals and Hollywood movies that would generate so much money Simon would never have to work another day in his life." Pg. 64

(f)     "Up all night, the effect of booze and cocaine tapering off, Simon caved, *he signed a statement prepared by Ciolino,* declaring that he had killed Hillard because Hillard was going for a weapon and Green, accidentally, because she had gotten in the way." Pg. 64

(g)     "Remarkably, *at Ciolino's direction, Simon rehearsed a confession prepared earlier by Ciolino.* Equally remarkable, Simon then donned a T-shirt at Ciolino's request; took a seat in a living room easy chair; and after Ciolino pulled out his video equipment and rolled the tape, solemnly read the confession *that had been scripted by Ciolino.*" Pg. 64

(h)     "Ciolino shared an office with Abrams and arranged for him to represent Inez in getting her obstruction of justice charge dismissed." Pg. 65

(i)     "The wholesale deprivation of his client's rights *by the gun-toting Ciolino* and cohort Arnold Reed would be brought to light. *Threat against his client's life would be revealed. The house of mirrors that had been fabricated that day by Ciolino and Reed.*" Pg. 97

(g)     "He [Rimland] didn't tell Simon that he, Rimland, *was being paid by Ciolino.*" Pg. 99

(h)     "He [Rimland] did not tell Simon that he was aware that Ciolino had coerced witnesses to implicate Simon in the murders in exchange for money and reduced sentences." Pg. 100

(i)     "Rimland never challenged the illegal and outrageous confession extracted from his client by his West Jackson Boulevard officemate [Ciolino]." Pg. 187

(j)     "Nor did they know the details of how Ciolino extracted his illegal confession." Pg. 191

(k)     "For this perversion of justice to have succeeded from the outset and to have gone on for as for as long as it did, members of the media and four specific individuals had to abandon their professional obligations. Assistant State's Attorney Tom Gainer, Simon's lawyer Jack Rimland, investigator Paul Ciolino, and Northwestern Professor David Protess all had to ignore or fail in their presumed roles in order for Simon to replace Porter in prison. . . . *Had Ciolino acted in concert with his profession's ethical guideline, instead of threatening Simon with physical harm and "bull-rushing" him until "he just could not recover," there never would have been a phony and illegal confession in the first place.*" Pg. 197-198.

120.     As a proximate result of the foregoing defamatory statements by Defendant

Crawford, Plaintiff suffered injuries, including injuries to his reputation.

121.     Indeed, the defamatory statements are *per se* defamatory as they impute the commission of criminal offenses, impute an inability to perform or want of integrity in the discharges of duties related to Mr. Ciolino's employment.

122.     The foregoing defamatory statements were made by Defendant CRAWFORD with the knowledge of their falsity and with actual malice, so as to justify an award of punitive damages. Minimally, defendant CRAWFORD published these false and defamatory statements with a high degree of awareness that they were probably false.

123.     As stated more fully above in paragraphs 109-115, Defendant CRAWFORD was hired by Defendant HALE to write the manuscript that would ultimately become the documentary MIP. Defendant CRAWFORD knew that SIMON had been fed a false narrative that claimed that Ciolino coerced him to confess since Defendants DELORTO and MAZZOLA had discussed this plan at the meeting of the "Real Warriors" in 2012 on Chicago's westside. Certainly, Defendant CRAWFORD possessed serious doubts as the truthfulness of the claims he published in his book.

124.     In his acknowledgements, Defendant CRAWFORD writes:

*Justice Perverted: How The Innocence Project at Northwestern University's Medill School of Journalism Sent an Innocent Man to Prison* would not have been possible without the enduring assistance of three individuals . . . The two others: retired Alcohol, Tobacco and Firearms agents Jimmy Delorto and Johnny Mazzola without whom Alstory Simon never would have been freed from his wrongful incarceration. The two former agents, working as licensed private investigators, were the first to discover the injustice imposed on Alstory Simon, the first to identify those responsible for the injustice, and the first to bring the miscarriage to the public's attention.

125.     Having fully researched the case, Defendant CRAWFORD was also fully aware that SIMON had confessed no fewer than six times to this crime.

33

## COUNT III – DEFAMATION
**(Against Defendant Preib)**

Plaintiff hereby incorporates, in their entirety, each and every paragraph contained in this complaint and by reference makes said paragraphs a part hereof as if fully set forth herein.

126.    Defendant PREIB writes a blog entitled  "Crooked City: The Blog about the Wrongful Conviction Movement" www.crookedcity.org

127.    Defendant Preib has made numerous false and defamatory statements with respect tot his case, including false and defamatory statements against Mr. Ciolino.

128.    The following is a list of false and defamatory statements made on Defendant PREIB's blog.

| DATE | TITLE | FALSE AND DEFAMATORY STATEMENT |
|------|-------|-------------------------------|
| 6/22/2015 | Who's On First? | "A private investigator, Paul Ciolino, who was working with Northwestern Professor David Protess, burst in to Simon's apartment on a cold February day in 1999 armed with a handgun, claiming he had evidence against Simon for the murders, including witness statements from Simon's ex-wife and another man. *Ciolino trumped other evidence as well and threatened Simon that if he didn't go along with the plan, he would get a life sentence or perhaps even the death penalty. Play ball, Ciolino told Simon, and you'll get a few years and we'll give you a cut of the movie and book deal money.*" <br><br>In the six months between Simon's arrest and his confession, he was in agony in the countl jail. Simon said he did not want to confess to the crimes, but says his attorney, Jack Rimland, *who was obtained for him by Protess and Ciolino*, threatened Simon that if he didn't plead guilty, he would get the death penalty or life sentences. <br><br>Simon was lied to by Protess and Ciolino. He was coerced into confessing on tape after Ciolino presented him with false evidence and threatened with the death penalty or several life sentences. |

| | | |
|---|---|---|
| 6/29/2015 | "Murder In the Park" A Stab in the Back? | Simon had been framed by former Professor David Protess and private investigator Paul Ciolino as part of a larger plan to get Anthony Porter exonerated for a 1982 double homicide. If Protess and Ciolino could frame Simon by getting him to confess to the murders, then Porter could get out of prison. |
| 7/11/2015 | An Open Letter to the PLO | When private investigator Paul Ciolino, working on behalf of Northwestern Univesity, went to the residence of Alstory Simon in 1999, armed, and threatened violence and trumped up criminal charges in order to get Simon to confess to a double murder he did not commit, that was bullying.<br><br>When Ciolino and former Professor David Protess made deals with other witnesses to provide false testimony to free sociapathic killer Anthony Porter, that was bullying.<br><br>When Ciolino and former Professor David Protess manipulated naïve Northwestern students to take part in their plan to frame Alstory Simon, that was bullying.<br><br>When Ciolino and student Thomas McCann badgered Taylor into changing his eyewitness testimony in the Porter case, that was bullying. |
| 12/3/2015 | Preckwinkle Won't Tell the Whole Truth in Bid for Control of Prosecutor's Office | "It was all the fault of David Protess, a once heralded, now disgraced fired former professor at the University's Medill School of Journalism; of Northwestern University for its lack of supervision of Protess; *of Paul Ciolino a small-time private eye who once threatened to shoot a suburban man in the head . . ."*<br><br>"Gainer knew full well that Simon's confession to the pool shootings had been extracted through threats of violence and evil sleights of hand wrought by an armed Ciolino, the small time gum show and an armed Ciolino associate who had invaded Simon's house in January, 1999" |
| 12/28/2015 | After Acquittal of Police Commander, Nine Murders Hang Heavy on Eric Zorn | Zorn could have looked fairly at the facts of the case all the way back in 2005. But he didn't. In doing so, he acted as kind of media henchman for Northwestern Professor Protess, *Ciolino and the rest of the wrongful conviction zealouts who had fraudulently exonerated Anthony Porter and framed Alstory Simon.* |
| 2/21/2106 | Special Prosecutors? | Protess and his student had made these claims based upon coerced confession by a private investigator, Paul Ciolino, working for them. The man they coerced a confession from was Simon. |

| | | |
|---|---|---|
| 3/30/2016 | A Toast, of Sorts, to the Real Warriors . . . | Simon had been framed as part of a depraved plot by Northwestern University, David Protess and his private investigator, Paul Ciolino. By getting Simon to confess to the murders he did not commit. Protess and Ciolino were able to spring Anthony Porter from death row.<br>But Crawford saw the case for what is was, a criminal conspiracy by Protess and Ciolino. |
| 4/11/2016 | Justice Department Ignores Key Evidence in Takeover of Chicago Police | Northwestern, David Protess and Paul Ciolino were once internationally renowned as crusaders for justice. Now they are looking more like con men, worse, even, given the accusations of using their students to seduce statement from witnesses and offenders. |
| 4/18/2016 | Lightfoot Cops Out Again | More so, the community of law firms, law schools and activists working hand in and with Protess on wrongful convictions, including Lightfoot's own University of Chicago Law School, never noticed the evidence that a Northwestern professor was pimping out its students either, *nor the evidence that his private investigator, Paul Ciolino, was bribing witnesses and committing obstruction of justice, all in effort to vilify cops."* |

129.    As a proximate result of the foregoing defamatory statements by Defendant PREIB, Plaintiff suffered injuries, including injuries to his reputation.

130.    Indeed, the defamatory statements are *per se* defamatory as they impute the commission of criminal offenses, and impute an inability to perform or want of integrity in the discharges of duties related to Mr. Ciolino's employment.

131.    The foregoing defamatory statements were made by Defendant PREIB with the knowledge of their falsity and with actual malice, so as to justify an award of punitive damages. Minimally, defendant PREIB acted with a high degree of awareness that the statements he published were probably false.

132.    Like Defendants DELORTO, MAZZOLA, and CRAWFORD, Defendant PREIB was present at the meeting of the "Real Warriors" in 2012 on Chicago's westside where they

discussed the plan to spread the false narrative regarding Protess and Ciolino as one of the "strategies" designed to combat the innocence movement.

133.    Indeed, Defendant CRAWFORD dedicated his book to "Marty Preib, a Chicago policeman, author, and blogger, whose indefatiguable and fearless drive went a long way in helping unmask the injustice visited on Alstory Simon."

134.    Defendants CRAWFORD and PREIB were actively part of the conspiracy put into play by Defendants DELORTO, MAZZOLA, along with EKL, SOTOS, and HALE who also bankrolled this conspiracy.

## COUNT IV –FALSE LIGHT
### (Against All Defendants)

Plaintiff hereby incorporates, in their entirety, each and every paragraph contained in this complaint and by reference makes said paragraphs a part hereof as if fully set forth herein.

135.    As set forth in specificity in Counts I, II and III of this Complaint, Defendants placed Plaintiff Ciolino in a false light before the public when they knowingly advanced a false narrative in: (1) the documentary MIP (2) the book "Perverted Justice;" and (3) in various articles posted on Defendant PREIB's blog, "Crooked City" claiming that Ciolino used illegal and unethical tactics to coerce Alstory Simon into confessing to a double homicide -  all for the purpose of making Anthony Porter a 'poster boy' for abolishing the death penalty

136.    Critically, MIP consists largely of re-enactments using actors to act out this false narrative. MIP features vignettes of an actor resembling Plaintiff Ciolino using illegal and unlawful tactics, including violence and bribery, to force SIMON to confess to the crime.

137.    That false light in which he was placed is highly offensive to a reasonable person since the allegations clearly involve claims of crimes and unethical conduct.

138.     As set forth fully in the defamation claims, *supra*, the Defendants knew that the statements were false and acted with actual malice. Certainly, Defendants acted with reckless disregard for the truth.

### COUNT V – INTENTIONAL INFLICTION OF EMOTION DISTRESS
### (Against all Defendants)

Plaintiff hereby incorporates, in their entirety, each and every paragraph contained in this complaint and by reference makes said paragraphs a part hereof as if fully set forth herein.

139.     Defendants DELORTO, MAZZOLA, EKL, and SOTOS engaged in extreme and outrageous conduct when they agreed to induce Defendant SIMON to make false statements about the circumstances under which SIMON made a video-recorded statement to Plaintiff Ciolino.

140.     Providing SIMON with money, promises of freedom, and even more money from an eventual lawsuit (the one filed here), Defendants DELORTO, MAZZOLA, EKL, and SOTOS contrived a false and injurious narrative that Plaintiff Ciolino had engaged in criminal acts against SIMON. This scheme to falsely accuse and defame Ciolino was designed to ruin the reputation of David Protess and Northwestern University. Indeed, when Mr. Ciolino was served with the summons and complaint in this lawsuit, Defendant DELORTO told Ciolino "Jim [Defendant SOTOS] told me to tell you, you could be a witness in this lawsuit as easy as you can be a Defendant" In other words, Ciolino was collateral damage and if he just agreed to 'turn on' Protess, they would drop the claims against him.

141.     Defendants DELORTO, MAZZOLA, EKL, and SOTOS acted with malice when they supplied SIMON a false narrative describing Ciolino's conduct in obtaining his confession. As set out more fully, *supra*, the Defedants *knew* the narrative was false, because SIMON had made multiple confessions to the murder which were corroborated by statements from his family

and other circumstances; and until Defendants DELORTO and MAZZOLA visited with SIMON, SIMON never claimed his innocence or claimed that his confession was coerced.

142.  Defendants EKL, SOTOS, and ALVAREZ doubled-down on their outrageous conduct when ALVAREZ agreed to dismiss all charges against SIMON, conducting no meaningful investigation other than accepting as truth, Defendants EKL and SOTOS' outrageous claims that SIMON had been coerced to confess to Ciolino and was actually innocent.

143.  Defendant ALVAREZ's decision to release a murderer who admitted his guilt to the crime no fewer than six times, is perhaps the most outrageous offense of all. ALVAREZ's decision to drop all charges against SIMON was an outrageous act in light of the overwhelming evidence of guilty against SIMON.

144.  Defendant HALE engaged in extreme and outrageous conduct when he financed and produced a documentary that he knew contained false and defamatory statements about Ciolino. Defendant HALE, a lifetime defender of police officers charged with misconduct – including his client (many times over) Jon Burge, created this documentary with the assistance of the other defendants for the purpose of gutting the innocence movement – an outrageous act that has caused severe emotional distress.

145.  Similarly, Defendants CRAWFORD and PREIB engaged in extreme and outrageous conduct when CRAWFORD published his book "Perverted Injustice" and PREIB his blog "Crooked City," knowing that those publications contained false, defamatory, and highly injurious statements about Defendant Ciolino.

146.  Defendants either intended to inflict severe emotional distress or knew that there was a high probability that the conduct would cause severe emotional distress.

147.     Recently, Defendant CRAWFORD emailed Plaintiff Ciolino a promotional flyer about a speech he was giving promoting his book at the Chicago Public Library. The email was intended to taunt Ciolino and demonstrates Defendant CRAWFORD's intent to inflict severe emotional distress on Ciolino.

148.     As a proximate result of Defendants outrageous acts, Plaintiff has sustained severe and extreme emotional distress, including depression, anxiety, fear, and sleep and eating issues.

149.     Defendant's reputation as a private investigator has been decimated, leaving it difficult for him to work in his field of expertise. Ciolino has worked in the investigative field for decades. He recently gave up his detective's license because he no longer has clients for which the license serves a purpose. Ciolino used to give lectures all over the world at a rate of approximately 25 a year. He has not be asked to give a lecture in the past year. Ciolino was making a good living prior to these publications and now earns virtually nothing. Ciolino routinely hears this phrase, "we'd love to use you but this lawsuit is killing you. Sorry."

150.     Defendant receives regular hate mail and phone messages, including unnerving death threats as a result of Defendants' extreme and outrageous conduct. The following is a sampling of some facebook/email and phone and messages received by Defendant CIOLINO:

> Your a fuckin' shit bag . . get cancer and die already, what you did to Al is fuckin' sick I hope you can't sleep
>
> You are a piece of shit
>
> Youre sick
>
> Truly a chump
>
> You are a disgrace! An absolute disgrace, I hope you know that.

You're a fucking prick. You ruined a man's life, you coerced him, manipulated him, threatened and tormented him until he folded and did what you demanded of him. And once your shit was found out, you called the lawsuit frivolous. I hope you end up working the rest of your amoral life in order to pay him back for what you took from him.

And why did your poster boy for wrongful conviction (even though he killed two people) not get a dime from his lawsuit and it was told to the press that the guilty man has been sitting in this courtroom. You are nothing but a piece of shit who has to lie and threaten people in order to get the answers you wanted even though you knew they were false. You and your piece of shit buddy Protes should be sitting in prison next to the murderer you lie to get off. Read this you fat fuck.

## **COUNT VI – CIVIL CONSPIRACY**

Plaintiff hereby incorporates, in their entirety, each and every paragraph contained in this complaint and by reference makes said paragraphs a part hereof as if fully set forth herein.

151.    Defendants conspired by concerted action to accomplish an unlawful purpose or a lawful purpose by an unlawful means.

152.    In furtherance of the conspiracy, Defendants committed overt acts and were otherwise willful participants in joint activity.

153.    The acts of misconduct described in this Complaint were undertaken with malice, willfulness, and reckless indifference to the rights of others (and to the truth).

154.    As a proximate result of the Defendants' conspiracy, Plaintiff suffered damages, including severe emotional distress and anguish, as more fully alleged above.

WHEREFORE, Plaintiff, PAUL CIOLINO, respectfully asks that this Court enter judgment in his favor and against the named Defendants, jointly and severally, for compensatory damages in a sum greater that $25,000,000, punitive damages, costs, as well as any other relief this Court deems just and appropriate. Defendant Ciolino further demands a jury trial.

Respectfully Submitted,

/s/JENNIFER BONJEAN
*Attorney for Paul Ciolino*

Jennifer Bonjean
Bonjean Law Group, PLLC
1000 Dean St., Ste. 422
Brooklyn, NY  111238
718-875-1850 (p)
718-230-0582 (f)
Jennifer@bonjeanlaw.com