# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| ALSTORY SIMON, | ) | |
| | ) | |
|     *Plaintiff*, | ) | |
| | ) | |
|     v. | ) | Case No. 1:15-CV-1433 |
| | ) | |
| NORTHWESTERN UNIVERSITY, DAVID PROTESS, PAUL J. CIOLINO, | ) ) | Judge Robert M. Dow Jr. |
| | ) | Magistrate Judge M. David Weisman |
| | ) | |
|     *Defendants*. | ) | |

## MEMORANDUM OPINION AND ORDER

The motion before the Court is Defendant's motion to compel. Defendant Ciolino issued a subpoena to the documentary film company Whole Truth Films ("WTF"), and its two owners Hale and Rech (hereinafter "the filmmakers"), commanding the production of certain unpublished materials[1] related to the production of the documentary *Murder in the Park* ("MIP"). The filmmakers refused to produce the subpoenaed materials on the basis they are protected under the Illinois Reporter's Privilege Statute. (Opp'n Ciolino's Mot. Compel, ECF 170 at 1.) Defendant Ciolino now moves this Court to compel the filmmakers to comply with the subpoena. (Ciolino's Mot. Compel ¶ 1, ECF 150.) The parties are well-acquainted with the facts of the case, but the Court will review the most relevant facts for purposes of clarity.

---

[1] The subpoena commanded production of "[c]opies of all audio and visual data, recordings, digital files, tape, drives, produced or created during any part of the production of 'Murder in the Park' . . . . [and] all transcripts, treatment, scripts, drafts of scripts, notes, transcribed interviews, recorded interview, memos, outlines, logs of footage, scripts and emails that pertain in any way to the production of 'Murder in the Park'" (Ciolino's Mot. Compel, Ex. A., ECF 150. )

1

**I. Background**

Plaintiff maintains that Defendant Ciolino, Defendant Protess, and Northwestern University conspired to frame him for a double-murder he did not commit. (Compl., ECF No. 1.) Plaintiff alleges that in the wake of prestige and notoriety stemming from a series of highly successful wrongful conviction investigations, a Northwestern investigative journalism class set out to secure the release of Anthony Porter, a man on Illinois' death row for double-murder, in pursuit of yet another successful exoneration. (*Id.*) Defendant Ciolino was an investigator who worked on the case. To secure Porter's release, Plaintiff alleges that Defendants needed an alternative suspect: Plaintiff. (*Id.* ¶ 81.) Plaintiff contends that during the investigation of the Porter/ Simon case, Defendants *inter alia*, manufactured false evidence and witness statements in order to secure the release of the true killer and frame Simon for the very same crimes. (*Id.* at ¶¶ 2-3.)

At the termination of Defendant's investigation, Porter was free and Plaintiff was incarcerated for the same double-murders. Plaintiff subsequently spent fifteen years in prison until the charges were vacated by the Cook County State's Attorney's Office. (*Id.* ¶ 124.) Plaintiff's complaint is fraught with examples of unethical investigatory techniques allegedly employed by Defendant; but the veracity of those allegations is not at issue for purposes of this motion. Significant to the Court today, is that the production company, Whole Truth Films, produced a documentary entitled *Murder in the Park* that mirrors Plaintiff's allegations, *i.e.*, that with the support of Northwestern, Defendants Ciolino and Protess framed Alstory Simon for murders he did not commit. (Mot. Compel, ECF, ¶ 2, No. 150.)

Andrew Hale, one of Plaintiff's attorneys in this action, was an executive producer on *Murder in Park*. *Murder in the Park* tells the story about how Defendants created false evidence

2

against Simon to frame him for the double-murders as part of a scheme to free Porter. (*See* Mot. Compel, ¶¶ 2-3, ECF No. 150.) The movie contains interviews from witnesses[2] referenced in Plaintiff's complaint as well as prison interviews with Simon. (*Id.* ¶¶ 6-10.) During one interview in particular, Simon accused Defendant Ciolino of forcing a confession from him. (*Id*.)

Production for the documentary began in December of 2012, prior to Plaintiff's release from prison. (Tr. Evid. Hr'g at 29, ECF No. 254.) At the evidentiary hearing before the Court, Hale stated he originally chose to make a documentary about Plaintiff's case because he thought it was interesting that "two people claim[ed] they were wrongfully convicted for the same crime." (*Id*. at 28.) His goal in producing the documentary was to inform the public about Simon's case. (*Id*. at 28-29.) Hale's role in the making the documentary included reading case documents, coordinating and conducting witness interviews, determining what footage to shoot, helping to develop the story structure of the piece, and reviewing raw footage. (*Id*. at 25-26, 125.) While Hale was working on the documentary, he did not represent Simon and was otherwise unaffiliated with the underlying legal proceedings related to Simon's quest for exoneration. (*Id*. at 30.)

Production of the film officially concluded in October of 2014, after Plaintiff was released from prison. (*Id*. at 36-37.) Hale states he joined Plaintiff's legal team within a week of Plaintiff's release. (*Id*. at 37.) Although production concluded, Hale still has access to the raw film footage and can view it at any time. (*Id*. at 115.) However, he has not provided any of the

---

[2] Some of these same witnesses had earlier provided information that was used as the basis to charge and convict Plaintiff. (*See* Ciolino's Mot. Compel ¶ 7, ECF 150). "Critically, MIP contains interviews with the witnesses referenced in Plaintiff's Complaint. For example, MIP includes a scene showing [Simon's estranged-wife,] Inez Jackson on her death bed, barely coherent, claiming that she falsely accused Simon of the [murders]. MIP also contains interviews with other members of Inez Jackson's family, including her daughter with Simon.

3

*Murder in the Park* outtakes to Plaintiff or the other members of Plaintiff's legal team. (WTF First Reply at 4, ECF No. 247.) He also states that he has not shared any off-the-record information provided to him by his confidential sources during his newsgathering for *Murder in the Park*. (*Id.*)

As stated above, Defendants issued a subpoena to the filmmakers commanding the production of certain unpublished materials. The filmmakers refused to produce the materials on the grounds they are protected under the Illinois reporter's privilege statute. The issue before the Court is whether Hale waived the reporter's privilege by joining Simon's legal team.

## II. Discussion

### A. Illinois Reporter's Privilege

The Illinois reporter's privilege protects reporters from being compelled to disclose their sources. 735 Ill. Comp. Stat. 5/8-901. Pursuant to the Illinois Reporter's Privilege Statute (hereinafter "Act" or "Statute"), a court cannot "compel any person to disclose the source of any information obtained by a reporter" unless a court orders a divestiture of the privileged source sought. *Id.* at 901 & 907.

A reporter is any "person regularly engaged in the business of collecting, writing or editing news for publication through a news medium on a full-time or part-time basis; and includes any person who was a reporter at the time the information sought was procured or obtained." *Id.* at 902. A source is the individual or means through which the information was obtained. *Id.* The reporter holds the reporter's privilege. *People v. Pawlaczyk*, 724 N.E.2d 901, 905 (Ill. 2000) ("[T]he privilege [is] granted to reporters under the Reporter's Privilege Act").

While the privilege belongs to the reporter, the source is the subject of the Statute's protection. *Id.* at 901.

The Court held an evidentiary hearing to learn about the filmmakers' role in producing the documentary. In light of the information presented at the hearing, the Court found that based on the filmmakers' duties and responsibilities with respect to filming, editing, and producing, the filmmakers were clearly "reporters" within the meaning of the Statute. The Court also found that the compelled materials (*see supra*, n.1) were the filmmakers' "source." The Court did not make a finding of whether the privilege had been waived. Therefore, the application of the privilege turns on whether the privileged was waived.

Before we turn to the issue of waiver, the Court will summarize its reasoning as to the first two issues. The filmmakers spent significant time, money, and resources in creating the documentary. Hale's involvement is detailed *supra.* The Court also heard from Hale's business partner, Shawn Rech, who detailed his involvement in *Murder in the Park*, and media productions in general. (Tr. Evid. Hr'g at 131, ECF No. 254.). Rech has spent almost his entire professional career in television and film production, with a focus on criminal justice issues. Applying the Illinois Reporter's Privilege definition of a reporter, Hale and Rech both fit comfortably within the definition. While creating *Murder in the Park,* they both were "regularly engaged in the business of collecting, writing or editing news for publication through a news medium[.]" 735 Ill. Comp. Stat. 5/8-902(a). Although Hale was also a practicing attorney during this same time period, the Illinois reporter's privilege applies as long as the individual was "a reporter at the time the information sought was procured or obtained," and allows a "reporter" to act in that capacity on a "full-time or part-time basis." *Id.* The Act does not forbid dual-employment. Thus, the fact that Hale was a practicing attorney on unrelated cases during

the time he was working on the documentary, does not preclude him from falling within the definition of a reporter under the statute.[3]

Ciolino argues that the MIP was not a news product created by "a vigorous, aggressive, and independent press," but rather a "piece of propaganda" created "to promote a litigation theory" that benefited Simon. (Ciolino First Reply at 2, ECF No. 246.) Ciolino cites to *Chevron Corp. v. Berlinger*, 629 F.3d 297 (2nd Cir. 2011) as illustrative of the factual and legal principles involved here. In *Chevron,* the oil giant sought outtakes and raw footage from a film producer who had been solicited by plaintiffs' counsel "to create a documentary depicting [the litigation issues at hand] from the perspective" of the plaintiffs. *Id.* at 302. Finding that the reporter's privilege did not apply, the *Chevron* court held:

> The [reporter's] privilege is designed to support the press in its valuable public service of seeking out and revealing truthful information. An undertaking to publish matter in order to promote the interests of another, regardless of justification, does not serve the same public interest, regardless of whether the resultant work may prove to be one of high quality. It is not the policy of the law to exempt such undertakings from the obligation to produce information relevant to a dispute before a court of law.

*Id. at* 308. We do not quibble with the observations or rationale of the *Chevron* court. However, there is no direct evidence that Hale, Rech, or WTF was engaged to produce a "promotional" piece for Plaintiff. The Court accepts Mr. Hale's uncontradicted testimony that he and Rech began the MIP project with a goal of gathering and explaining the story behind the convictions of Porter and Simon, and not with an agenda or ulterior motive in mind. (*See* Tr. Evid. Hr'g at 30-31, ECF No. 254.) The fact that Hale joined Plaintiff's legal team after the movie's release provides a modicum of circumstantial evidence to support the notion that Hale was not actually acting as an independent journalist when he produced MIP. However, the Court is more than

---

[3] We also have little trouble concluding that the film is a "news medium." Considering the statutory language, the film "was a news [reel] or other motion picture news for public showing." 735 Ill. Comp. Stat. 5/8-902(b).

comfortable based on Mr. Hale's testimony and demonstrated candor during the hearing that WTF was not a publicist for Plaintiff, but rather engaged in a journalistic effort.

Second, we turn to whether the materials sought by the subpoena are the "source" of WTF's journalistic efforts. The subpoena seeks *inter alia* all audio and visual data, notes, drafts, and transcribed interviews gathered by WTF in the creation of MIP. Clearly, these materials are the source from which MIP was created. Neither Ciolino nor the filmmakers argues otherwise.

### B. Waiver

From the Court's perspective, the primary issue before the Court is whether Hale waived the reporter's privilege when he joined Simon's legal team. The Statute is silent on waiver, and there is only one case in Illinois that discusses the issue. *See People ex rel. Scott v. Silverstein*, 412 N.E.2d 692 (Ill. App. Ct. 1980), *rev'd on other grounds*, 429 N.E.2d 483 (Ill. 1981). In *Silverstein*, a litigant sought to depose a reporter who had written numerous articles on the subject matter of the case before the court. 412 N.E.2d at 693. Based on previous discovery in the matter, it was undisputed that the reporter had shared some of the information he had gathered with plaintiff's counsel, but not the defense (hence the need for a deposition). Specifically, on two occasions the reporter asked plaintiff's counsel about the status of the investigation but did not provide any information to the attorney, one occasion where the reporter asked about the legality of certain conduct that was alleged in the case, and one conversation subsequent to the publication of the article to "simply to check on what [the attorney] was planning to do." *Id*. The lower court found that the reporter had waived the privilege as to the matters that were divulged to the attorney. *Id*. On appeal, the issue was whether the reporter had waived the privilege by disclosing information to plaintiff's counsel.

*Id.* at 694. The *Silverstein* court held that the reporter's actions did not constitute a waiver because the reporter had not given the attorney any information that had not already been published.

At the end of the opinion, the *Silverstein* court noted that there was no evidence that the reporter had "abandoned the role of newspaper reporter and assumed the duties of an investigator." *Id*. (internal citations omitted). Had such behavior occurred, the reporter "arguably . . . [would have] waived his reporter's privilege." *Id*. The *Silverstein* court found that the record did not support a finding that the reporter took on a role of investigator. *Id*. Rather, the record reflected that the reporter's contact with the attorney was "clearly within the scope of [the reporter's] role as a newspaper reporter." *Id*.

The filmmakers argue that a waiver of the reporter's privilege, in light of the *Silverstein* ruling, is "extremely limited and only occurs where the reporter expressly discloses information to a third party but also makes that disclosure outside the reporter's newsgathering activities." (WTF First Reply at 3, ECF No. 247.) Therefore, because no express waiver outside of Hale's reporting activities occurred, the filmmakers argue that Hale has not waived the reporter's privilege.

Contrary to the filmmakers' assertion, the only guidance the *Silverstein* court provided on what *does* constitute waiver is the statement that a reporter arguably waives the privilege when she acts outside of the scope of a reporter and assumes the duties of an investigator. Hale waived the reporter's privilege because he clearly acted outside of the scope of a reporter when he became an attorney on Plaintiff's legal team. When Hale filed an appearance on Plaintiff's case, he abandoned the role of reporter and transitioned to the role of legal advocate. After serving as

Plaintiff's counsel for more than two years, Hale cannot artificially divest himself of that status in order to take advantage of the reporter's privilege.

The Statute was enacted to support a free press and public access to information; it was clearly not meant to be used as a vehicle for a party to initiate litigation and retroactively use the reporter's privilege to keep information out of discovery. *See, e.g., Waterloo/Cedar Falls Courier v. Hawkeye Cmty. Coll.*, 646 N.W.2d 97, 102 (Iowa 2002) ("[A] waiver of the [reporter's] privilege has most often been found where the plaintiff put the sought-after information into issue in the litigation and then attempted to prevent its disclosure by invoking the shield of privilege."); *cf Ayala v. Ayers,* 668 F. Supp. 2d 1248, 1250 (S.D. Cal. 2009) (finding that after the author gave an unpublished manuscript to Petitioner "[i]t would be unfair and improper to allow [the author] to invoke the journalist's privilege with respect to this same material now that Respondent's counsel wants to see it"); *Pinkard v. Johnson*, 118 F.R.D. 517, 523 (M.D. Ala. 1987) ("A reporter is not free to give a sworn statement to a litigant, and later invoke the qualified reporter privilege to keep this information from the Court."). If Hale had produced MIP and simply continued to follow the Simon saga at a distance, the material gathered by the filmmakers would be safely ensconced by the reporter's privilege, only subject to disclosure if divestiture was appropriate. *See* 735 Ill. Comp. Stat. 5/8-903 ("[W]here a person claims the [reporter's] privilege, the person . . . seeking the [privileged] information . . . may apply in writing to the circuit court . . . for an order divesting the person named therein of such privilege and ordering him or her to disclose his or her source of the information.") But, instead Hale chose to become as intimately involved in the Plaintiff's litigation as possible by joining Plaintiff's legal team. Assertion of the reporter's privilege in this context is well beyond the scope of the statute.

Relying on *Silverstein,* the filmmakers argue that a waiver only occurs if there is an express disclosure of privileged information to a third party. (WTF First Reply at 4, ECF No. 247.) They further cite to court holdings outside of Illinois to support this position. None of the cases the filmmakers cite, *Wheeler v. Goulart*, 593 A.2d 173 (D.C. 1991), *Pinkard v. Johnson*, 118 F.R.D. 517 (M.D. Ala. 1987), *Altemose Constr. Co. v. Building & Constr. Trades Council*, 443 F. Supp. 489 (E.D. Pa. 1977), address the application of the Illinois reporters privilege to a reporter-turned attorney. Thus, they are inapposite.

Even considering these cases' persuasive authority, coupled with the filmmakers' view of the *Silverstein* holding (a view we consider overly broad), the filmmakers' argument remains misplaced. A reporter gathers information from her sources for the very purpose of disclosing the information. Thus, a reporter obviously cannot waive her privilege as to undisclosed source information by sharing other portions of the gathered source information with the public. Unlike other privileges (*e.g.* attorney-client, clergy-parishioner, doctor-patient) where the information is gathered with an understanding that it will not be shared, the reporter's privilege recognizes that a reporter gathers information from sources for the very purpose of sharing the information with the world-at-large. What *Silverstein* and the other cases identified by the filmmakers acknowledge is that a reporter who shares information that she *later* claims to be privileged risks compromising the privilege.[4] Because we find that Hale "shared" all of the information he

---

[4] In *Silverstein*, the reporter shared two documents and other information "most of which was made public" in published articles. The court found that this did not constitute waiver of the privilege. In *Wheeler*, the reporter shared her source for information related to an on-going police investigation, and the court found a limited waiver of privilege, ordering the reporter's testimony to be confined to the identity of the source. In *Pinkard*, the reporter provided an affidavit to plaintiff's counsel, and the court allowed the reporter to be deposed only as to the affidavit's substance, denying broader discovery requests. Finally, in *Altemose*, the court limited a discovery deposition to "an identification of the material which was actually broadcast[ed]" even though some of the information had been shared with third-parties. None of these cases informs the situation before this Court. None of these cases involves the wholesale conversion of an individual's role from journalist to counsel in a case involving the very same issues that motivated the journalistic effort.

gathered during the making of MIP when he joined Simon's legal team, he has placed at risk all of the source information that may have been shielded by the reporter's privilege.

The filmmakers contend that because "no evidence exists that Mr. Hale made any express disclosure of any privileged material to anyone, let alone the legal team representing Mr. Simon in this matter" the privilege could not have been waived. (WTF First Reply at 4, ECF No. 247.) The Court finds this argument nonsensical. As a preliminary matter, the Court finds it troubling that throughout the filmmakers' briefs, Hale evades the fact that he is *on* Plaintiff's legal team. So the assertion that Hale has not disclosed privileged information to anyone on Plaintiff's legal team is simply false. If Reporter A joins Plaintiff Attorney B's legal team as an investigator, and then shares every single piece of unpublished information he has learned while producing a documentary on the subject of Attorney B's case, then clearly Reporter A has waived the reporter's privilege. If Reporter A could somehow magically transfer that same information to Attorney B's head without uttering a word the same analysis would apply: Reporter A waived the reporter's privilege. Finally, if Reporter A *transformed into* Attorney B and brought with him all of the information he learned from producing the documentary then Reporter A/Attorney B waived the reporter's privilege.

What permeates the filmmakers' motion is the failure to recognize the consequences of acting as a reporter and a lawyer on the same matter. Hale's decision to serve in both capacities is the equivalent of an explicit waiver. On the one hand, Hale argues he should be afforded the protections of the reporter's privilege because he has not disclosed any unpublished information from the documentary. On the other hand, he argues the reporter's privilege is intact because he disclosed the information to Defendant in discovery, that is, while acting as a lawyer. (*See* WTF Second Reply at 3, ECF No. 263 ("Ciolino ignores the fact that the information gained by Mr.

11

Hale as a reporter about the identity of relevant witnesses is equally available to both parties. The names of all relevant witnesses are available to Mr. Ciolino either because they are identified and interviewed in the Documentary or because their names have been provided during discovery in this matter.").) Under Hale's analysis, he would enjoy both the benefits of the reporter's privilege and the attorney-client privilege throughout this litigation. Unfortunately for Hale, he cannot have it both ways. Hale cannot pick and choose when it is convenient for him to be a lawyer and when it is convenient for him to be a reporter -- for the man who chases two rabbits catches neither. The Court finds that by joining Simon's legal team Hale has waived the reporter's privilege as to all materials gathered in the production of *Murder in the Park*.

In the interest of completeness, we also address the legal ethics issues raised by Ciolino. (Ciolino First Reply at 9-10, ECF No. 246 (citing ABA Model Rules of Prof'l Conduct R. 1.7(a).) Ciolino argues that Hale cannot attempt to shield his mental processes as a lawyer from the information he gathered while producing *Murder in the Park* because Hale owes a duty of loyalty to Plaintiff, which includes the "duty to zealously prosecute his claim using all available evidence." As a preliminary matter, Ciolino argues that it would be impossible for Hale to separate the information he learned as a reporter from the information he gathered as attorney in his head. (*Id*. at 9 ("Hale cannot shield himself from information he already possesses. Even if Hale had the special power to shield himself from information already in his brain, it would be impossible separate out the evidence/discovery developed during the filming of MIP with the evidence developed in the course of the legal investigation.")) And second, even if Hale does possess the power to distinguish between the different sources of information in his brain, Ciolino contends that if Hale obtained information beneficial to Plaintiff's case as a reporter, now as Plaintiff's attorney, Hale would be obligated to use that information in prosecuting

12

Plaintiff's claims, ignoring the information to maintain the reporter privilege would amount to an ethical violation. Ciolino argues these mental gymnastics would deprive Plaintiff of Hale's effective representation. Rule 1.7(a)(2) reads, in pertinent part, that "a lawyer shall not represent a client if that representation . . . will be materially limited by the lawyer's responsibilities to . . . a third person or by a personal interest of the lawyer." Ciolino argues that Hale's personal interest in protecting the reporter's privilege runs afoul of Hale's obligations under Rule 1.7. For their part, the filmmakers argue that any conflict under Rule 1.7 is waivable, and therefore does not control the resolution of this issue. (WTF First Reply at 5-7, ECF No. 247.)

We offer no opinion on whether Mr. Hale's representation of Plaintiff is a conflict under Rule 1.7, or whether such conflict is waivable because we believe these issues are beside the point. Significant to the Court is that Defendants are comparatively disadvantaged by Hale's involvement in Plaintiff's representation for the last two years: Plaintiff's counsel (through Hale's mind and memory) has access to certain relevant information and Defendants' counsel does not. Based on the motion to compel, Defendants appreciate this inequity and have rightfully demonstrated their unwillingness to forgive the situation. Defendants have not brought this motion to protect Plaintiff's right to effective representation, but rather to ensure a robust defense for themselves. Thus, Plaintiff's willingness to waive any conflict under Rule 1.7 cannot overcome the Defendants' right to "any nonprivileged matter that is relevant to any party's claim or defense" and otherwise satisfies the scope of Fed. R. Civ. P. 26(b)(1).

Filmmakers further argue that even if a non-waivable conflict exists under Rule 1.7, Ciolino cannot force Hale to disclose assertedly reporter's privileged information because "attorney conflict rules are designed to protect the clients of a conflicted lawyer, not harm those clients by requiring the lawyer to divulge privileged information to the clients' courtroom

13

adversary." To drive home the point, the filmmakers argue, "If Ciolino's remedy is correct, any lawyer who has a conflict of interest with two clients would have to surrender all privileged materials . . . because the imputed waiver strips away all privileges." (WTF First Reply at 8, ECF No. 247.) As to filmmakers' first point, we agree. The conflict rules are designed to protect *an attorney's* clients. But this observation does not answer or inform the issue before the Court. As to the filmmakers' second point, they are wrong. A lawyer who has gathered information under the attorney-client relationship and later is conflicted from the representation continues to have an obligation to protect the privileged information she has gathered. *See* ABA Model Rules of Prof'l Conduct R. 1.9(c) ("A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter. . . reveal information relating to the representation except as these Rules would permit or require with respect to a client.") *See also United States v. Williams*, 698 F.3d 374, 392 (7th Cir. 2012) ("Rule 1.6 imposes no time limits on the duty of confidentiality, and paragraph 18 of the comment makes explicit that the duty of confidentiality continues after termination.") (criminal case). A later arising conflict does not "strip away" the privileged nature of pre-existing information obtained during the course of the representation.

Thus the filmmakers correctly state that they "have been unable to find any court decisions declaring that a conflict of interest between a lawyer and client requires that the client loses all privileged information." (WTF First Reply at 8, ECF No. 247.) The only, and significant, problem with this argument, however, is that motion does not involve either a conflict between, or the privilege of, Hale's clients (past or present). Neither the Court nor Ciolino suggests that any of those privileges should be infringed upon. Rather, this motion deals

exclusively with the filmmakers' ability to assert the Reporter's Privilege now that Hale has actively participated in Plaintiff's representation for more than two years.

In sum, the situation presented to this Court has little to do with attorney-client privilege. The ABA Model Rules of Professional Conduct cited by the parties address issues arising from conflicts between an attorneys and their clients; they do not address or even contemplate the conflicts of privilege when an attorney acts as both counsel and a journalist in the same matter. Borrowing from the filmmaker's query noted above, we believe the proper inquiry is: "If Ciolino's remedy is correct, any journalist who creates a conflict of interest by choosing to join the legal team handling the same matter that the journalist investigated would have to surrender all privileged materials related to the prior journalistic efforts." We believe the answer to this question is a simple and definitive 'yes.'

## **Conclusion**

For the reasons stated above, the Court grant's Defendant Ciolino's motion to compel against Whole Truth Films [150].

In conclusion, we note that this opinion is premised on a unique set of facts that we suspect unlikely to reoccur – a journalist converted to an attorney representing a party in a civil action premised on the original journalistic effort. Thus, we caution that the precedential value of this opinion to resolve waiver under Illinois' reporter privilege should be considered cautiously. The issue of waiver under the Act is complex, and very factually driven. The factual scenario presented here is extremely unique. We believe the legal analysis of waiver in other contexts would require far more detailed considerations.

SO ORDERED.                              ENTERED:        May 5, 2017


_M. David Weisman_
M. David Weisman
United States Magistrate Judge